WILLIAM K. COORS AND PHYLLIS E. COORS, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2837-69, 2839-69, 2840-69.    Filed June 12, 1973.

---

[1] Proceedings of the following petitioners are consolidated herewith: Joseph Coors and Holly H. Coors, docket No. 2839-69; and Adolph Coors Company, docket No. 2840-69.

*Gene W. Reardon*, for the petitioners.
*Marvin T. Scott*, for the respondent.

DAWSON, *Judge:*[*] Respondent determined the following deficiencies in the Federal income taxes of petitioners:

| Petitioners | Docket No. | Year | Deficiency |
| --- | --- | --- | --- |
| William K. Coors and Phyllis E. Coors | 2837-69 | 1966 | $3,926.00 |
| Joseph Coors and Holly H. Coors | 2839-69 | 1965 | 7,952.00 |
| | | 1966 | 7,803.00 |
| Adolph Coors Co | 2840-69 | 1965 | 3,838,154.33 |
| | | 1966 | 1,268,786.83 |

Various concessions have been made by the parties and will be given effect in the Rule 50 computations. The issues remaining for decision are:

(1) Whether the doctrines of res judicata and collateral estoppel apply to certain capitalization adjustments made by the respondent.

(2) Whether the cost basis of certain self-constructed assets has been understated by the Adolph Coors Co.

[*] Pursuant to a notice of reassignment sent to counsel for all parties, and to which no objections were filed, these cases were reassigned by the Chief Judge on Dec. 13, 1972, from Judge Austin Hoyt to Judge Howard A. Dawson, Jr., for disposition.

(3) Whether respondent's adjustments brought about a change in the accounting method for the costs of the company's self-constructed assets.

(4) Whether adjustments under section 481, I.R.C. of 1954, are applicable.

(5) Whether the inventory adjustments with respect to the company are proper.

(6) Whether certain land development costs incurred by the company are deductible business expenses or capital expenditures.

(7) Whether certain paving and fencing costs are capital expenditures or deductible business expenses.

(8) Whether certain property qualifies as section 38 property and is eligible for the investment tax credit.

(9) Whether membership dues in social clubs paid by the company on behalf of two stockholders are business or personal expenses and whether such amounts constitute dividend income to the shareholders.

(10) Whether certain payments made to influence legislation are deductible by the company as business expenses.

(11) Whether William K. Coors is entitled to deduct a net loss from the rental of a condominium in Aspen, Colo., in 1966.

(12) Whether the payment by Joseph Coors of a guarantor obligation in 1965 constituted a business or nonbusiness bad debt.

FINDINGS OF FACT

Some of the facts have been stipulated by the parties. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

*General*

William K. Coors and Phyllis E. Coors, petitioners in docket No. 2837–69, are husband and wife. Their legal residence at the time they filed their petition herein was in Golden, Colo. Their joint Federal income tax return for the year 1966 was filed with the district director of internal revenue at Denver, Colo.

Joseph Coors and Holly H. Coors, petitioners in docket No. 2839–69, are husband and wife. Their legal residence was in Golden, Colo., when they filed their petition herein. Their joint Federal income tax returns for the years 1965 and 1966 were filed with the district director of internal revenue at Denver, Colo.

Adolph Coors Co. (sometimes referred to herein as either the company or the corporation), petitioner in docket No. 2840–69, is a Colorado corporation. Its principal place of business as of the date the petition was filed herein was at Golden, Colo. Its Federal corporation income tax returns for the years 1965 and 1966 were filed with the

district director of internal revenue at Denver, Colo. The corporation is an accrual basis taxpayer. Its taxable year is the calendar year.

In 1873 a brewery business was started by Adolph Coors, the father of Adolph Coors, Jr. William K. Coors and Joseph Coors are sons of Adolph Coors, Jr. The brewery has been located in its present location at Golden, Colo., since that date. In 1913 the business was incorporated under the laws of Colorado and the stock of Adolph Coors Co. has been held by the Adolph Coors family since incorporation. A substantial amount of the corporation's capital stock is owned either directly or beneficially by William K. Coors and Joseph Coors.

During the years 1965 and 1966 the principal officers of the corporation were: William K. Coors, president and chairman of the board; Joseph Coors, executive vice president; Adolph Coors, Jr., treasurer; and Ray V. Frost, financial vice president and secretary. The executive committee was comprised of these same offices. These officers and Herman F. Coors, now deceased, comprised the board of directors of Adolph Coors Co. Herman F. Coors resided in Arizona.

The principal business of the corporation is the manufacture and sale of beer. The manufactured beer is placed in bottles, cans, and kegs at its Golden, Colo., manufacturing plant, from where it is shipped either by railroad car or truck and sold to its 180 distributors throughout the 11 Western States of the United States. Adolph Coors Co. is a regional-type brewery and limits its market to 11 Western States. It has only one production plant.

### Res Judicata and Collateral Estoppel

In its petition herein the company has affirmatively pleaded res judicata and collateral estoppel with respect to the capitalization adjustments for 1965 and 1966, and with respect to the section 481 adjustment for 1965.

In a previous notice of deficiency involving the years 1962, 1963, and 1964 respondent determined that the company should have capitalized certain construction department overhead costs and maintenance and certain costs of engineering department overhead.

In the section of his brief captioned "Questions Presented" filed in Adolph Coors Co., docket No. 3179–66, the respondent made the following statements:

Respondent hereby abandons the adjustment made in the statutory notice of deficiency in the amount of $405,567.07 for 1962, $560,942.25 for 1963, and $310,-866.81 for 1964 in Docket No. 3179–66. These amounts represented costs of construction overhead and maintenance and costs of engineering department overhead. Respondent also is hereby abandoning adjustments in the amount of $59,-009.60 for 1962, $95,931.74 for 1963, and $122,076.56 for 1964. These amounts represent depreciation on construction equipment which respondent determined to be capital expenditures rather than operating expenses. By abandoning these

adjustments, the respondent does not concede one way or the other that Adolph Coors Company's accounting treatment for these items is correct. The respondent is merely abandoning any attempt to change Adolph Coors Company's treatment of these items for the taxable years 1962, 1963, and 1964. These items were referred to at paragraphs 4D and 4G of the petition in Docket No. 3179–66.

In this Court's Memorandum Findings of Fact and Opinion in *Adolph Coors Co.*, T.C. Memo. 1968–256, it was stated:

The Commissioner in his brief *abandons* the disallowances of deductions made in the deficiency notice of $405,567.07 for 1962, $560,942.25 for 1963, and $310,-866.81 for 1964 representing corporation costs of construction overhead and maintenance and costs of engineering department overhead. He also *abandons* disallowances of $59,009.60 for 1962, $95,931.71 for 1963 and $122,076.56 for 1964 representing depreciation on construction equipment of the corporation. [Emphasis added.]

In the notice of deficiency for the years 1962, 1963, and 1964 the amounts capitalized by the respondent were determined by adding 5 percent to the company's capitalized construction costs for such overhead. No specific account-by-account analysis was done. The 5-percent figure was an admitted estimate. No effort was made in the previous litigation to make either a section 481 adjustment or an inventory adjustment. The respondent did not believe the earlier adjustment rose to the level of a change in accounting methods but rather considered it merely a correction of an error. The present litigation involves a change in accounting methods and a section 481 adjustment.

## Capitalization of Overhead

A. *Growth in demand.*—Since the repeal of prohibition in 1933 the company has steadily increased its production and sales. During the period from 1934 through 1966 sales and production have increased at an average compounded annual rate of 13 percent. The company projected a substantially similar pattern for the subsequent 6 years including 1972.

Throughout this expansion period the company has increased its productive capacity to meet consumer demand for its product. This capital asset program has been largely, if not entirely, self-constructed. The company has long thought that economies of scale and production would be essential if it were to survive in the highly competitive brewing industry. During the past 20 years the price of Coors beer charged by the company to its distributors has not increased. By 1966 the company ranked 10th in volume of sales among the Nation's brewing companies. It is the largest regional brewery in the Nation.

The company employs numerous engineers who perform the planning, designing, development, and architectural work required for its capital additions program.

The capital-budgeting decisions involve long lead times. The increase in sales with its concomitant increase in production requirements means that the company is at times working on some 700 different design phases of construction. Each phase must be closely coordinated with production requirements, material procurement, and construction scheduling.

The company erects buildings and other needed structures from its internally developed plans. The company also designs and builds much of the machinery and equipment needed in its brewing operations. The company is able to use its own work force and equipment to build these structures. Most maintenance and repair work is done by its own employees. By doing its own building and maintenance the company obtains two advantages: (1) The production of beer is not interrupted and (2) the cost of such construction is reduced. The industry capitalization cost is approximately $40 per barrel of output. Adolph Coors Co. is able to obtain its productive capacity at less than half the industry-wide figure.

To finance its capital asset acquisitions the company relies on internally generated funds. The company does not borrow any capital funds. In 1965 the company had noncurrent (those due in more than 1 year) liabilities of only $643,922.

A 1965 management report noted that plant expansion was proceeding at an ever-accelerating pace. The company had reduced its construction activity in 1964 due to cash-flow difficulties. The report then stated that "with 400 employees engaged in actual construction, 70 in design engineering and approximately 30 in supporting staff work, 37 percent of our total staff and much of our top level executive effort is directly involved in plant expansion."

During 1965 the company employees were categorized for record-keeping purposes in three classes: (1) Office, salaried, and management, (2) plant, and (3) construction. There was a monthly average of 354 persons in office, 588 in plant, and 300 in construction in Golden, Colo. For 5 months during the year about 31 employees were engaged in construction activities in Monte Vista, Colo. The number of employees engaged in construction rose throughout the year 1965 from 204 in January to 398 in December. The steady increase in this area of activity continued into 1966. For 1966 the company employed each month an average of 515 persons in construction work. In January 1966, there were 416 so employed; and by December 1966 there were 580 persons employed in such work.

For 1966 the monthly average employment in office, salaried and management, totaled 425; plant required an average of 651 persons per month; and construction required 515. The company was growing

rapidly, especially on the production side of its business. The construction activity increased to keep up with demand. During 1965 the company management was of the opinion that this increased construction activity would enable it to work from a base of adequate facilities "for the sales challenge ahead."

There are three major organizational efforts made by the company. The office and administrative staff work supports the line employees—those who actually produce the finished product—and the other support group involves the construction efforts of an average of over 400 persons. These individuals are employed by the company because of a long-standing policy of self-sufficiency and increased output at a constant sales price.

B. *Accounting practices and procedures.*—The company has, for cost accounting purposes, 45 separate departments. There is no separate department for the construction activities.

Because of the nature of its product, the company's accounting system has been organized and adapted to a full-cost absorption process costing system.

In accounting for self-constructed assets the company capitalizes only certain indirect costs. Indirect costs are not allocated to fixed assets. The company engineers, when working on a capital asset, have their salaries capitalized into the cost of the asset. Engineering department expenses which go through the cost absorption system are not allocated to a fixed-asset account. They are treated as expenses by the company and are written off without being reflected either in inventory or in cost of goods sold.

In its chart of accounts the company closes garage costs into truck-operating cost. This cost is then allocated to departments on the basis of usage determined by timecards kept for each vehicle. Certain of these costs are then allocated to fixed assets. Although some of the plant management, personnel, and occupancy expenses are distributed to various accounting departments, these costs are not allocated to fixed assets.

Some costs incurred are charged to one of 45 departments. From there they are further allocated to certain subaccounts for cost accounting purposes. At yearend these costs are then regrouped in order to comport with the reporting requirements of the company's Federal income tax return.

According to Ray Frost, the financial vice president, the company-wide effort is concerned with the production of beer. All efforts are directed to such end. The "construction group" of Coors numbered 12 when Frost began working for the company in 1926. In those days the crew was called Elmer Johnson's Gang. It was their job to build and maintain the company's property. The company now has a main-

tenance crew doing the day-to-day work of keeping the plant operating efficiently. Major repair jobs as well as construction work are performed by the construction personnel. During the years 1965 and 1966 the construction crew engaged in repair and maintenance work 17.8 percent of their time. In computing his allocations to capital assets, the respondent adjusted the charges incurred by the construction group to reflect this factor.

The construction personnel, when engaged in repair work, would have their time and materials charged in various subledger repair accounts in the department involved.

As one of its 45 accounts the company has an occupancy account, number 0502. To this account was charged the departmental expenses of the construction effort. From the occupancy account these charges are then distributed among 14 different departments. A part of the charges to this account are thus reflected in cost of goods sold. The balance of these expenses are treated as general selling and administrative expenses. No part thereof is allocated to fixed asset accounts.

The total amounts charged by the company to the occupancy subledger during 1965 and 1966 were $1,901,353 and $2,399,936, respectively. Respondent broke these accounts down and, as a result, capitalized and added to income $886,729.29 for 1965 and $1,346,851.34 for 1966. For 1965 the respondent capitalized 46.6 percent of the amounts charged to occupancy. For 1966 he determined 56.1 percent of these charges to be capital in nature.

The following table shows the adjustments made by respondent:

| Account | 1965 | | | 1966 | | |
|---|---|---|---|---|---|---|
| | Gross adjustment | Deductible as repair | Amount capitalized | Gross adjustment | Deductible as repair | Amount |
| (a) Occupancy-direct labor. | $89,952.37 | $15,993.53 | $73,958.84 | $99,055.90 | $8,617.86 | $90,438.04 |
| (b) Occupancy-supervision. | 63,406.55 | 11,273.68 | 52,132.87 | 133,096.79 | 11,579.42 | 121,517.37 |
| (c) Occupancy-S/W for repair | 234,095.27 | 41,622.14 | 192,473.13 | 212,771.23 | 18,511.10 | 194,260.13 |
| (d) Occupancy-matl. for repair | 124,523.28 | 20,724.62 | [1] 95,836.82 | 187,372.64 | 15,640.22 | [1] 164,132.42 |
| (e) Occupancy-supplies exp. | 227,952.92 | 40,530.03 | 187,422.89 | 370,566.41 | 32,239.28 | 338,327.13 |
| (f) Occupancy-general. | 7,585.80 | 1,348.76 | 6,237.04 | 8,331.76 | 724.86 | 7,606.90 |
| (g) Occupancy-rent. | 5,334.33 | 948.44 | 4,385.89 | 9,213.21 | 801.55 | 8,411.66 |
| (h) Occupancy-group ins. | 12,304.74 | 2,187.78 | 10,116.96 | 10,569.72 | 919.57 | 9,650.15 |
| (i) Occupancy-comp. ins. | 72.55 | 12.90 | 59.65 | 2,452.42 | 213.36 | 2,239.06 |
| (j) Occupancy-pers. dept. costs. | 10,318.68 | 1,834.66 | 8,484.02 | 11,258.24 | 979.47 | 10,278.77 |
| (k) Occupancy-plant mgt. and research. | 15,406.02 | 2,739.19 | 12,666.83 | 16,520.61 | 1,437.29 | 15,083.32 |
| (l) Occupancy-truck costs. | 120,466.33 | 21,418.91 | 99,047.42 | 215,241.90 | 18,726.05 | 196,515.85 |
| (m) Occupancy-retirement plan costs. | [2] 80,269.54 | 14,271.92 | [2] 65,997.62 | 97,395.92 | 8,473.45 | [2] 88,922.47 |
| (n) Occupancy-depreciation bldgs. | 18,359.47 | 3,264.31 | 15,095.16 | 20,943.81 | 1,822.11 | 19,121.70 |
| (o) Occupancy-depreciation, M&E. | 76,397.65 | 13,583.50 | 62,814.15 | 88,002.60 | 7,656.23 | 80,346.37 |
| Totals. | 1,086,445.50 | 191,754.37 | 886,729.29 | 1,482,793.16 | 128,341.82 | 1,346,851.34 |

[1] Adjusted to reflect concessions made by the parties.
[2] Conceded by respondent in toto.

The charges to "Occupancy-Direct Labor" that reflected the cost of those support personnel not of the skilled-craftsman class engaged in construction activities were withdrawn and capitalized. These individuals work on any given job as directed. They are supportive of the skilled labor employed by the company.

A further charge to this account involved storeroom labor who spent one-half of their working hours in support of the construction department.

During 1965 this account was charged with $191,597.09. Of this, $89,952.37 was construction related. Reduced by the "repair percentage" amount of $15,993.53, the balance ($73,958.84) was capitalized. For 1966 this same procedure resulted in the capitalization of $90,438.04.

The "Occupancy-Supervision" amount was adjusted for salaries paid construction supervisors. The bulk of the salaries paid construction supervisors is capitalized with respect to the capital asset then being constructed. Any salary paid to these supervisors for time not actually spent on site is charged to the occupancy account. Such non-onsite payments include sick leave, vacation pay, jury duty, and the like.

There are certain construction supervisors whose function does not include onsite supervision. The supervisors in central scheduling or in the sheet metal shop do not work on a particular job. The salaries paid to these persons are charged to the occupancy account and deducted. Respondent reduced this by the standard repair percentage of 17.78 and capitalized the balance.

The account "Occupancy-Salaries and Wages for Repair" was charged with vacation and holiday pay for foremen, repair work on construction department machinery, and indirect support activities for the construction effort. To reflect the indirect support activities respondent reduced the gross adjustment by 10 percent in addition to the standard repair percentage. For 1965 the amount capitalized was $192,473.13 of the $458,073.53 charged to the account. For 1966 the adjustment totaled $194,260.13 of $470,686.25 so charged.

The charge to "Occupancy-Repair Materials" was adjusted to reflect materials purchased to maintain tools and equipment used in the construction work. This adjustment totaled $95,836.82 for 1965 and $164,132.42 for 1966. The supplies expense subledger in occupancy was reduced by $187,422.89 for 1965 and $338,327.13 for 1966. The respondent arrived at these adjustments not by an item-by-item examination of all supply material purchased for these 2 years. A random sample was used. All vendor invoices for February 1966 were analyzed. Each vendor supplying more than $500 charged to this account in 1965 and $1,000 in 1966 was listed. Of the $276,516.67 charged to this account

in 1965, $243,762.67 worth of supplies were procured from vendors doing $500 or more in business with the company. The $1,000-or-above class of vendors supplied $361,229.97 of the $422,396.69 charged to this account in 1966.

In 1965 the respondent charged 80 percent of the supplies to construction and 20 percent to occupancy. The 1965 repair allocation of 17.78 percent was then applied to arrive at the 1965 capitalization figure.

For 1966 the construction effort consumed 84 percent of the supplies charged to this account, while occupancy utilized the remaining 16 percent.

To arrive at the capitalization ratio the respondent determined that, if over one-half of the dollar amount of the invoice was delivered to "construction receiving," then the entire dollar amount was allocated to construction. If over one-half of the dollar amount of the invoice was delivered to general stores, then one-half was allocated to construction and one-half to occupancy.

In arriving at the net adjustment for 1966 the respondent used as a repair allocation 8.70 percent, reducing the gross adjustment of $370,566.41 to $338,327.13.

The account "Occupancy-Material for Repair" was analyzed in the same manner as supplies expense. The cost of those materials procured primarily for the purpose of maintaining construction equipment was capitalized after a repair allocation was made. In 1965 the adjustment was $95,836.82; for 1966 it was $164,132.42. Both of these amounts were adjusted to reflect concessions made with respect to residence repairs.

The minor adjustment to "Occupancy-General Expense" resulted from the capitalization of janitorial services contracted outside the company. These services were rendered exclusively to the construction group.

The minor adjustment of "Occupancy-Rent" represented rental payments for various tools and equipment used in construction. After being reduced by the repair allocation, the balance was capitalized.

Respondent adjusted four nonoccupancy accounts during these 2 years. These were:

| Adjustment | Amount capitalized | |
| --- | --- | --- |
| | 1965 | 1966 |
| Group insurance | $57,753.34 | $76,014.21 |
| Plant management and research | 71,135.15 | 116,001.57 |
| Personnel department | 46,597.27 | 81,290.99 |
| Compensation insurance | | 17,471.77 |

These costs are allocated quarterly to various departments on the basis of a ratio of the salaries and wages of the particular department re-

ceiving the allocation to the total wages of all departments receiving the allocation.

A portion of the payroll costs of employees working on capital asset projects is capitalized by the company. The percentage is developed by dividing the salaries and wages of the particular department by the total wages of all departments receiving the allocation. This figure is then applied to the cost group being allocated. These costs are then distributed to various accounting departments in the brewery, to occupancy, and finally to "Payroll Taxes, Capital Accounts."

The same percentage figure showing capitalized salaries is also allocated every quarter to group insurance costs, compensation insurance costs, personnel department costs, and plant management and research costs. These are then charged to a profit and loss account, "Payroll Taxes, Capital Accounts." The amount in this account was taken as a deduction by the company.

Respondent capitalized these claimed deductions dollar for dollar. No repair allocation adjustment was made.

In the occupancy accounts the company maintains the following subaccounts: (a) Occupancy-group insurance costs, (b) occupancy-compensation insurance costs, (c) occupancy-personnel department costs, and (d) occupancy-plant management and research costs. A portion of the costs of these four groupings is allocated quarterly to the four occupancy accounts bearing the same title. To arrive at the gross capitalization adjustment of the accounts the respondent used the same wage and salary figures used by the company. After being reduced by the repair percentage allocation, the balance in these accounts was capitalized.

The company maintains a garage-cost subledger as well as a truck-operating-cost subledger. Garage costs are all closed into truck-operating costs quarterly.

During 1965 and 1966 a portion of these costs were allocated to capital assets. In 1965 truck-operating costs totaled $539,565.77 of which $153,717.44 was charged to occupancy. In 1966 of $823,865.46 truck-operating costs the sum of $268,614.96 was charged to occupancy.

Here again the respondent arrived at his allocation on the basis of a statistical sampling procedure. The analysis of activity showed 82.59 percent of the expense to be attributable to construction, 6.10 percent to occupancy, and 11.31 percent was unidentified. The 11.31 percent was not capitalized. Only the 82.59 percent was capitalized. After a repair allocation was applied, the balance was capitalized and disallowed as a current expense.

For 1965 the respondent adjusted the account "Occupancy-Depreciation, Buildings" with respect to construction property, such as the shops and other out buildings. The depreciation claimed, reduced

by the repair allocation, was disallowed as a deduction and capitalized. This was $15,095.16 in 1965 and $19,121.70 in 1966.

The company charges, either directly or by means of an allocation, depreciation to the separate accounting departments. Depreciation is allocated on a timecard basis during which machinery and equipment are actually utilized on a particular capital project. When equipment is idle depreciation on equipment acquired prior to 1965 is charged to an idle equipment account. Depreciation on idle equipment acquired after 1965 is charged to "Occupancy-Machinery and Equipment."

The gross charges to these accounts were reduced by the repair allocation. The balances were disallowed as current expenses and capitalized. With respect to the nonoccupancy account, "Depreciation-Idle Equipment," the amounts disallowed are $25,966.81 for 1965 and $9,853.96 for 1966.

With respect to the account "Occupancy-Depreciation, Machinery and Equipment," the respondent determined that the standard repair allocation $62,814.15 in 1965 was improperly deducted as an expense. For 1966 the improper deduction was found to be $80,346.37. These amounts were capitalized by respondent.

The company maintains a purchasing department charged with the responsibility for all purchases for the company. During 1965 the monthly average employment level in the department was 12. In 1966 it rose to 24. The purchasing department maintains several employees on a full-time basis in the construction group in order to expedite their material requisitions. No part of the purchasing department costs is capitalized. They are expensed in full.

The purchasing department was split into two divisions. The efforts of about one-half of the purchasing department employees not physically located in construction related to securing materials needed for the construction of capital assets. Sixty percent of the department's total effort was found to be related to the procurement of construction material. Reduced by the repair allocation, this resulted in the disallowance in 1965 of $82,205.07 as an expense and $160,396.91 in 1966. These amounts were capitalized.

During 1965 and 1966 the monthly average number of employees working in the engineering department was 52 and 70, respectively.

Each engineer and draftsman keeps a timeslip to record time spent on each project during the day. These charges are periodically allocated to capital assets under construction.

Engineering costs and construction costs are treated substantially the same. The difference lies in the treatment of overhead costs. Those attributable to the engineering department are so charged. The various occupancy accounts are charged with construction overhead.

All engineering supplies and materials are currently deducted. No part thereof is allocated to fixed assets.

The costs incurred in research and development by the company are currently deducted.

In his analysis of the timecards, respondent found engineering time devoted to repairs as well as to research and development. For 1965, 29.06 percent was found; for 1966 it was 31.19 percent. These percentages were applied to the adjusted engineering department costs to reduce the adjustment to "repairs and other" costs. For 1965 and 1966 the respective amounts of engineering department costs capitalized were $122,779.99 and $157,389.02.

Certain construction workers' labor costs were charged to repairs in the accounting department in which new construction was in progress. These costs included the cost of scaffolding, toolroom runners, project rework, and site cleanup.

No repair allocation was made with respect to the following labor costs:

| Department | Capitalized | |
|---|---|---|
| | 1965 | 1966 |
| Steam building | $26, 416. 54 | $49, 667. 05 |
| Barley malting | 25, 867. 58 | 42, 075. 71 |
| Beer bottling | 97, 155. 63 | 145, 308. 35 |
| Brewing and cellars | 55, 032. 70 | 36, 074. 58 |
| Totals | 204, 472. 45 | 273, 125. 69 |

The amounts allocated to capital construction were further allocated by respondent to individual assets, thus increasing the basis in such assets.

For 1965 and 1966 additional investment credits of $26,150.79 and $40,140.22, respectively, were allowed by virtue of such capitalization.

The adjustments in capitalization charges resulted in an increase of $531,217.67 in allowable depreciation for the year 1965. This resulted in a corresponding decrease in 1965 taxable income.

For 1966 the increase in allowable depreciation was $511,977.38 with a similar decrease in taxable income.

*Change in Method of Accounting or Treatment of a Material Item and Section 481 Adjustment*

The company's practice of deducting in part as current expense and including in part in cost of goods sold a portion of the direct costs of new capital construction, and all of the indirect or overhead costs of new capital construction, does not clearly reflect income.

The disallowance by respondent of a major portion of the construction department and the engineering department indirect or overhead

costs, and the capitalization thereof, constitutes a change in method of accounting or a change in the treatment of a material item within the meaning of sections 446 and 481 (a) of the Internal Revenue Code of 1954.

Respondent's method of computation should be applied in determining the company's additional basis in self-constructed assets on hand January 1, 1965.

| Cost grouping | Amount | |
|---|---|---|
| | 1965 | 1966 |
| Relocation of 32d Ave | $26, 681. 63 | $129, 810. 33 |
| East Springs Earth Fill | | 40, 621. 06 |
| Straightening Clear Creek | | 12, 255. 54 |

Adolph Coors Co. is as self-contained as it is possible to be. The company attempts to be vertically integrated throughout its manufacturing process. It obtains Rocky Mountain spring water from wells drilled by it. It purchases hops from Bavaria, rice from California, and barley from Colorado. The seed to grow the barley, a most important ingredient to its product, is supplied to certain Colorado farmers by the company. Barley thus grown, which meets its specifications, is purchased. The company has enjoyed considerable success and is one of the 10 largest breweries in the country. It has achieved this status in spite of its regional markets and limited number of suppliers.

As a part of its drive for vertical integration, the company determined that it needed a plant to make its own aluminum beer cans to which it affixed its own labels.

The company's report of management to its shareholders for the year 1965 states:

The decision in late 1964 to erect a plant to make 11 oz. aluminum cans required much engineering study. The scope of the plant was increased to include facilities for 15 oz. and 12 oz. cans in addition to the 11 oz. package. In resolving the question of plant location, we ended up with a grand-scale industrial land development project involving some 100 acres of Clear Creek Valley land known to us as the East Springs area. Involved is the relocation of over a mile of state highway and several irrigation ditches and the straightening and re-channeling of Clear Creek. Involved also are 1,500,000 yards of land fill. With additional land parcels either presently acquired or in the mill, the initial 100 acre industrial site can be ultimately expanded to 800 acres which should be ample for the all time needs of our company.

The same management report noted that the "land involved, being almost entirely Clear Creek alluvium, is highly valuable land containing about $25,000 per acre of sand and gravel at today's prices." Predicting a critical shortage of the material in the near future, the company was confident that its value would further increase.

The company was being forced by market demand to operate at full capacity. The company was engaged in substantial capital improvement efforts. A 1966 management report noted that the engineering and construction departments were faced with a need to upgrade facilities and to simultaneously add "somewhere in the neighborhood of 500,000 barrels per year of additional brewing capacity."

The company was constantly faced with the need to acquire land upon which to expand its productive capacity to meet demand. It hoped to achieve parity by 1967. To the east of the company's main plants lay the East Springs area. Through this area of rocks and boulders ran numerous irrigation ditches dependent for their water upon Clear Creek. A public road also ran through this area further segmenting it. Clear Creek itself was an irregular freshet giving rise to a perennial flood threat. This possibility of flooding necessitated the construction of various protective dikes and levees designed to protect existing plant and equipment. As then constituted this area was unsuitable for building.

The company recognized the potential usefulness of this area, as reflected in the minutes of an executive committee meeting held March 17, 1965, in which the following was reported:

Chairman reviewed preliminary talk about locating the can plant east of our plant in the Clear Creek Valley, generally in the area of the land purchased from Val and Henry Blatter, just north of 32nd Avenue. The site could be filled up to about 7' under the 32nd Avenue level, the Lee Stewart and Eskins Ditch could be tubed and put alongside the road and make a fine area. It would be quite a job as the bottles and machinery now in the area would have to be taken out, the eastern part of the area which we had previously partly filled would have to be picked up, large rocks and concrete broken up, put back and compacted with more dirt being brought in to bring the area level up. After discussing the committee approved this area for the can plant.

Through the East Springs area ran at least 1 mile of 32d Avenue. In order to optimize the usefulness of the "grand-scale industrial land development project," this road had to be relocated to the south. The relocation was to serve two purposes: (1) The bisection of the project would be reduced and (2) the fill from the redeployment excavation could be utilized to raise the level of the East Springs area. Work on both tasks began in August 1965.

Since 32d Avenue was a public road the company was required to make a request to the board of county commissioners before moving ahead. At an executive meeting held June 22, 1965, the company's minutes show the following discussion:

Chairman presented a proposed change of 32nd Avenue east of plant on contour map showing it staying south of the Agricultural Ditch coming back into

present road just east of Twin Spruce Subdivision. He stated that in taking dirt for the fill from the new aluminum can plant they would be working in this area and would be doing part of the necessary work on the road relocation which would leave the area as a good site. After discussion it was approved by the committee. It was felt that it should be presented to the County Commissioners to see if they would approve.

The regular meeting of the county commissioners held on August 30, 1965, reflects in its minutes a request by the company, through its attorney, to be allowed to straighten West 32d Avenue. The work proceeded apace. The preparatory work, base work, culverts, irrigation ditch relocation was done by the company. The county paved the road segment itself. On October 31, 1966, old 32d Avenue was vacated by the county and title assumed by the company, and new 32d Avenue was dedicated by the company to the county.

The total amount spent on this project by the company was $156,491.96. This enabled the company to proceed with its plans.

In order to make the area useful as an industrial site the company incurred substantial costs during 1966 in hauling dirt and fill to the area. This was done in order to raise the level of the land surrounding Clear Creek. This fill was obtained from the site of the work on new 32d Avenue. The breakdown of the expenses shows the relative importance of the haulage. The complete cost was as follows:

| | |
|---|---|
| Purchases | $64. 61 |
| Equipment depreciation | 11, 571. 00 |
| Salaries and wages | 2, 809. 55 |
| Truck operating costs | 26, 175. 90 |
| Total | 40, 621. 06 |

In the general area of the site of the new aluminum can plant nearly 660,000 cubic yards of fill were utilized. This raised the ground elevation at this point by 30 feet.

While the East Springs land fill operation and the relocation of 32d Avenue were proceeding, the company was also engaged in straightening Clear Creek. During 1966 they spent $12,255.54 to do this. The channel of the creek was relocated and widened. In some areas the creek was moved approximately 1,000 feet in order to straighten its course and define its flow. Portions of the banks of the creek were raised and diked.

The entire effort of moving 32d Avenue, filling in the East Springs, area, and straightening Clear Creek was a part of a long-range development project. This project revitalized the area and made it possible to build additional productive capacity. The bettering of the land has had a beneficial effect on its value.

## Paving and Fencing Costs

In his notice of deficiency the respondent determined:

The amount of $7,961.84 claimed as expense for material for repairs is not allowed because it pertains to asphalt paving which is a capital expenditure. Of this amount, $7,617.84 is allowed as a depreciable asset and $344.00 pertains to residence furnished to Adolf Coors, Jr., which is disallowed as an expense deduction or as a depreciable asset. Therefore, your taxable income is increased $7,961.84.

On brief the respondent conceded the amount of $344 spent to repair certain asphalt driveways appurtenant to the residence of Adolph Coors, Jr. This left the $7,617.84 at issue. The expenditures were:

| Vendor | Amount |
|---|---|
| Table Mountain, Inc. | $872. 24 |
| Asphalt Paving Co. | 3, 745. 60 |
| Lifetime Fence Co. | 3, 000. 00 |
| Total | 7, 617. 84 |

Of the $7,961.84 claimed as an expense for 1965, the petitioner was able to produce invoices totaling $7,665.34.

The Table Mountain, Inc., invoices covered road base gravel material purchased during 1965. The invoices from Asphalt Paving Co. covered asphalt repair work between the cellars and Clear Creek as well as the application of a slurry seal on the employees' parking lot. The invoices from Lifetime Fence Co. covered repairs and replacement of various fences on the factory site.[2]

For 1966 the company claimed a deduction of $7,600 as repair expenses with respect to paving and fences. At the trial the petitioner orally conceded that paving costs in the amount of $4,248.76 should properly be capitalized. The remaining $3,351.23 expense deduction is poorly documented.

In disallowing the claimed expenses for paving and fencing costs, respondent determined that the assets had a useful life of 8 years and should have been depreciated on that basis.

## Investment Credits

A. *Duct work.*—During 1965 and 1966 the company placed into service sheet metal duct work in the basement and the fourth floor of its bottle-packaging building. In 1965 the petitioner spent $3,344.77 on such installation. In 1966 the petitoner further expended $13,656.62. The item here involved is approximately 3 to 5 feet thick, 6 to 10 feet

---

[2] The testimony adduced at trial from Mr. Field indicated the possession of invoices from Lifetime Fence Co. of $2,379.36. The difference between this and the respondent's capitalization of $3,000 was not explained.

wide, and 100 feet in length. The duct work is part of an air-handling system involving a louvered system mounted on the roof of the bottle-packaging building. There is included in this system an air plenum with a large filter installation. A water spray system and blowers complete the system. The duct work involved is attached to the package building by means of steel angle braces.

The equipment filters the air prior to diffusion in the area of distribution. The building is not completely serviced by this unit. The function of this air-handling equipment is to remove foreign matter from the air before it is released into the packaging plant.

Although the air is cooled by means of a water spray it is not an air-cooling system as such. The equipment is not utilized to heat this building. The heating function is performed by an independent and entirely separate system.

B. *Saw room.*—During 1965 and 1966 the company expended $6,900 and $500, respectively, in constructing a saw room. The investment credit was affirmatively claimed in the petition. The saw room is on a mezzanine floor in the bottle-packaging building. It is a solid constructed room of approximately 30 feet by 40 feet. It has a door and a window with a load-bearing roof. The room contains saws used to remove the tops from boxes containing returned beer bottles. The dust is removed by means of ventilating ducts. The bottles are then shunted off to a cleaning process before being refilled. The room encloses a conveyor belt system. The cartons enter the room via the conveyor through an opening in one wall and following the process exit through the other end of a continuous-feed process.

The investment credit was claimed for the expenditure involved in the construction of the room but not for the equipment contained therein.

C. *Valve testing room.*—In 1966 the company spent $4,870 in order to construct a valve repair and maintenance workshop. This room in the bottle-packing plant is capable of other uses.

The room itself is 30 by 20 feet in size. It is of masonry construction. The walls of this room are permanently affixed to the building. It has windows and doors. The roof of this room can be utilized as a storage area. A stairway on the outside of the room provides access to the rooftop storage area.

### Social Club Dues

During 1965 and 1966 the company paid the annual dues at various social clubs used by two of the principal officers of the company,

namely, William K. Coors and Joseph Coors. These club dues are as follows:

| Club | Dues | | Officer |
|------|------|------|---------|
| | 1965 | 1966 | |
| Lakewood Country Club | $484.00 | $372.00 | Joseph Coors. |
| Denver Country Club | 600.00 | 600.00 | Do. |
| Rolling Hills Club | 420.00 | 420.00 | Do. |
| Hiwan Golf Club | 240.00 | 240.00 | William K. Coors. |
| University Club | 333.60 | 343.20 | Do. |
| Denver Club | 360.00 | 360.00 | Do. |
| Denver Country Club | 600.00 | 600.00 | Do. |
| Garden of the Gods Club | 105.00 | 100.00 | Do. |
| Totals | 3,142.60 | 3,035.20 | |

During these years numerous other charges were incurred by William K. Coors and Joseph Coors. Such charges over the 2 years in question amounted to $4,558.10. Of these the corporation paid $948.12 (20.8 percent) and the individuals paid $3,609.98 (79.2 percent). Respondent did not disallow the entertainment expenses paid by the company. He did, however, disallow the claimed deductions totaling $6,177.80 for 1965 and 1966 dues paid.

In arriving at a breakdown of the charges as to those paid by the company and those paid by the individuals the respondent resorted to the handwritten notations made on the statements by the individual users.

During 1965 and 1966 Joseph Coors' business and personal use of the clubs, by days of use, as taken from the monthly statements was:

| Social club | Days of use | | | |
|-------------|-------------|---|---|---|
| | 1965 | | 1966 | |
| | Personal | Business | Personal | Business |
| Rolling Hills Club | 7 | 0 | 1 | 0 |
| Lakewood Country Club | 5 | 0 | 4 | 0 |
| Denver Country Club | 20 | 2 | 23 | 1 |

During 1965 and 1966 William K. Coors' business and personal use of the clubs, by days of use, as taken from the monthly statements was:

| Social club [3] | Days in use | | | |
|-----------------|-------------|---|---|---|
| | 1965 | | 1966 | |
| | Personal | Business | Personal | Business |
| University Club | 1 | 0 | 2 | 0 |
| Denver Club | 23 | 0 | 19 | 0 |
| Denver Country Club | 38 | 1 | 54 | 0 |

[3] The Hiwan Golf Club monthly statements do not reflect usage by day. During 1965 and 1966 the company paid only the dues while William K. Coor paid $786.74 and $953.39, respectively, for personal expenses incurred there.

Thus, out of a total 201 days-in-use, only 4 days may be attributed to business use and the remaining 197 days are attributed to personal use.

Respondent further determined that Joseph Coors realized dividend income of $1,504 for 1965 and $1,592 for 1966; and that William K. Coors realized dividend income in 1966 of $1,643.

These social club memberships have been maintained by the company in the names of the key officers for many years. Except for 1965 and 1966, the respondent has not questioned the deductibility of such payments. Several of the clubs permit corporate memberships which allow several named members from a single company to utilize the club. Other clubs refuse to permit this, and for business functions a named individual must be in attendance.

The company does business with all these clubs in that there are business functions scheduled there. Business guests are lodged there and make use of the facilities. Similarly all of the clubs serve the company's product—Coors beer.

### Payments Made to Influence Legislation

For each of the years 1965 and 1966 the company claimed a deduction for "dues and subscriptions." Certain of these payments were determined by respondent to have been made to organizations whose purpose and function it was and is to influence legislation. The organizations and amounts paid were:

| Organization | Amount | |
|---|---|---|
| | 1965 | 1966 |
| National Right to Work Committee | $100 | |
| Colorado Tax Equality Committee | 250 | |
| Committee for Constructive Government | 100 | $100 |
| Colorado Plan for Apportionment | | 1,000 |
| Committee for Nonpolitical Selection | | 250 |
| Totals | 450 | $1,350 |

### Aspen Condominium

William K. Coors acquired a condominium apartment in Aspen Colo., in late October 1965. During 1965 the apartment was not rented. William Coors and his wife spent some time at the apartment during the last quarter of 1965 readying the apartment for rental.

William Coors had a cost basis in the apartment and its furnishings of $41,897.

The apartment was operated under a rental agreement with a property management firm in Aspen which undertook to rent the apart-

ment for Mr. Coors. In addition to a management fee, the agent was to receive 20 percent of any rental income.

It was standard practice for William to receive, at some point during the summer, a calendar on which he was to block off the dates on which he proposed to use the apartment. The remainder of the time was available for rental. During 1966 William blocked out 1 week at Christmas and 1 week in the spring. For the balance of the year the agency attempted to rent the apartment. During 1966 the apartment was rented for approximately 21 days. For this period of rental William Coors received $788.

During 1966 William Coors reported a net loss from the condominium of $2,492. This was determined by adding depreciation ($2,039) to other deductions ($1,241) and deducting therefrom the rental income ($788). The respondent disallowed the net loss deduction of $2,492 asserting only that William Coors had not established that he was "entitled to such a deduction."

### Bad Debt

Sometime prior to 1965 Joseph Coors was interested in the perfection of an audiovisual device intended to permit communication between persons of different languages. The idea was related to him by a prep school companion. His interest aroused, Joseph Coors sought out and obtained the services of Paul Flury,[4] an engineer then working for Coors Porcelain Co. To enable Mr. Flury to proceed in the development work for this device, Joseph Coors guaranteed a loan made by the Golden State Bank to Paul Flury.

In 1964 Joseph Coors paid $1,253.83 in legal expenses incident to research and development of a patent of a visual and audio language interpreter. This claimed deduction was disallowed. In other litigation in this Court with the year 1964 at issue Joseph conceded that $450 paid in connection with the patent to an attorney to establish a corporation was not deductible. This patent was the first in which Joseph had any financial interest. The balance of the deduction was disallowed because there was insufficient proof to show that Joseph was regularly engaged in any business in which the amount paid to a patent lawyer would constitute an ordinary and necessary business expense.

Because of personal problems Mr. Flury terminated his employment with Coors Porcelain Co. and severed his relationship with Interpretor Corp. Mr. Flury has disappeared and no one has heard from him since 1965. During 1965 Joseph was called upon by the bank to repay the loan. He paid $2,167 to the bank under his guarantor obligation.

---

[4] The spelling of this individual's name varies in all briefs and the transcript.

On his 1965 Federal income tax return this sum was deducted as a business bad debt.

OPINION

## 1. *Res Judicata and Collateral Estoppel*

The Adolph Coors Co. has raised the defenses of res judicata and collateral estoppel with respect to respondent's capitalization of overhead costs. The company argues that (1) the same issue was in controversy between the parties for the years 1962, 1963, and 1964; and (2) that this Court finally determined the capitalization of overhead issue adverse to the respondent and therefore the issue is no longer properly before us.

The company states that our "redetermination of respondent's capitalized overhead determination in the old case for the immediate three prior years constitutes a sufficient judgment for res judicata purposes for the instant two following years." *United States* v. *Utah Idaho Sugar Co.*, 15 A.F.T.R. 1037 (D.C. Utah 1934), is cited. That case appears to have been one in which a complaint by the Utah Idaho Sugar Co., lodged in the U.S. Court of Claims, was dismissed upon agreement of certain "law officers" of the United States and counsel for the company. Later other U.S. "law officers" instituted an action in the U.S. District Court for the District of Utah seeking relief from the agreement. The District Court dismissed the action summarily. The same parties dismissed the cause of action in the Court of Claims and then one party sought relief from the effect of such dismissal in another forum. Labeling its reasons for dismissal "res judicata," the District Court dismissed the action, noting that the proper way for the Government to obtain relief was to directly attack the settlement and compromise. Whether or not such an attack would succeed in view of the court's previous finding of "res judicata" need not concern us here. We simply do not find the case controlling in these circumstances.

The capitalization of certain overhead for 1962, 1963, and 1964 was not settled and compromised by the parties. Respondent is not seeking in the present case a redetermination of those years with respect to the capitalization issue. The years involved in the present case (1965 and 1966) are different and distinct from the previous case. In the prior case *no findings*, either mediate or ultimate, were made by the Court with respect to such issue.

The doctrine of res judicata applies where issues that were or could have been determined in an earlier suit are presented anew to the Court. If such action is taken by one party to attempt to relitigate such issues, the idea of repose and consideration of judicial economy operate to bar further review. The necessity of finality applies in the area of

tax law as much as in other areas of the law. But the prior case did not result in any determination of the capitalization issue. The "significance of what a court says it decides is controlled by the issues that were open for decision." *Angel* v. *Bullington*, 330 U.S. 183, 187 (1947). The capitalization issue was merely abandoned by respondent for the 3 years then at issue. This Court did not reach that question in *Adolph Coors Co.*, T.C. Memo. 1968–256.

The doctrine of collateral estoppel applies where matters are actually litigated and determined in the first cause of action. This principle is stated in the Restatement, Judgments, sec. 68, as follows: "A judgment on one cause of action is not conclusive in a subequent action on a different cause of action as to questions of fact not actually litigated and determined in the first action."

The Supreme Court of the United States has said, in the area of consent judgments, that the spirit of justice requires the doctrine to be limited to cases where there was "an adjudication on the merits." *United States* v. *International Building Co.*, 345 U.S. 502, 506 (1953). *Lawlor* v. *National Screen Service Corp.*, 349 U.S. 322, 326 (1955), teaches that the doctrine should apply only as to "issues actually litigated and determined in the prior suit."

The argument that this Court would have determined the capitalization issue, except for the abandonment, is tenuous at best. It fails to consider the fact that each taxable period is a separate and distinct cause of action. The case of *Heasley* v. *United States*, 348 F.2d 40 (C.A. 8, 1965), cited by the petitioner, is not apposite. There the Heasley family was prevented from relitigating a previous tax lien judgment entered against them under the guise of a suit for damages against the United States. The Court of Appeals noted at page 42: "If anything is settled in the law, it is that the parties to a lawsuit and their privies are precluded from relitigating issues conclusively settled by a former judgment. [Citations omitted.]" Clearly the capitalization issue here involved has not yet been conclusively determined by any court of competent jurisdiction.

That portion of the doctrine of res judicata barring later litigation of that which could have been raised in the former proceeding must be viewed in the light of the principle set forth in *Burnet* v. *Sanford & Brooks Co.*, 282 U.S. 359 (1931), that each taxable year is separate and distinct. The respondent correctly points out that this doctrine does not override certain ameliorative provisions of the Code which seek to bridge the gap between separate years in order to avoid possible unintended and harsh results.

The historical and practical differences between res judicata and collateral estoppel were discussed by this Court in *John W. Amos*, 43 T.C. 50, 53–54 (1964), affd. 360 F.2d 358 (C.A. 4, 1965), as follows:

Collateral estoppel, or estoppel by judgment as it is often referred to, is an adjunct of the ancient judicial doctrine of res judicata.[3] While the two bear much in common, having derived from a singular purpose, they are by no means the same. Res judicata applies only to the *same* cause of action arising between the same parties. Its effect, where there has been a decision on the merits in a cause of action between two parties, is to preclude future litigation between those parties or persons claiming through them, "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which *might* have been offered for that purpose" in the prior proceeding. *Cromwell* v. *County of Sac*, 94 U.S. 351, 352 (1876). Collateral estoppel, on the other hand, applies in a *different* cause of action. It operates as an estoppel, not as to matters which might have been litigated and determined, but "only as to those matters in issue or points controverted, upon the determination of which the finding or verdict [in the prior case] was rendered." *Cromwell* v. *County of Sac, supra.* [Fn. omitted.]

Where "the cause of action involved in the second proceeding is not swallowed by the judgment in the prior suit, the parties are free to litigate points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time." *Commissioner* v. *Sunnen*, 333 U.S. 591, 598 (1948).

Collateral estoppel will not bar an issue that was neither pleaded nor considered even if it could have been dealt with. *Muriel Dodge Neeman*, 26 T.C. 864 (1956), affd. 255 F.2d 841 (C.A. 2, 1958). The application of collateral estoppel requires that the issue be considered by a court. If the court expressly refuses to discuss an issue, later litigation on the issue is not barred. See *Kimbell-Diamond Milling Co.*, 14 T.C. 74 (1950), affirmed without consideration of this point 187 F.2d 718 (C.A.5, 1951). The other end of the spectrum from issues not pleaded and consequently not barred involves findings not necessary to the determination of an issue. Here again collateral estoppel will not apply. *Moore* v. *United States*, 360 F.2d 353 (C.A. 4, 1965), affirming on this point 235 F. Supp. 387 (W.D. Va. 1964) ; *Laughlin* v. *Commissioner* (C.A.D.C. 1967, 21 A.F.T.R. 2d 869, 68–1 U.S.T.C. par. 9199), affirming per curiam a Memorandum Opinion of this Court; *Piper* v. *United States*, 392 F.2d 462 (C.A. 5, 1968).

In our opinion the interests of justice would not be properly served if the facts relating to the capitalization issue were to be deemed conclusively established on the basis of the prior case. See *The Evergreens* v. *Nunan*, 141 F.2d 927, 929 (C.A. 2, 1944), certiorari denied 323 U.S. 720 (1944), where the court said :

It often works very harshly inexorably to make a fact decided in the first suit conclusively establish even a fact "ultimate" in the second. The stake in the first

suit may have been too small to justify great trouble and expense in its prosecution or defense; and the chance that a fact decided in it, even though necessary to its result, may later become important between the parties may have been extremely remote. It is altogether right that the judgment shall forever put an end to the first cause of action; but it is not plain that it is always fair that every fact * * * decided in it shall be conclusively established between the parties in all future suits, just because the decision was necessary to the result.

That is the case here. The capitalization issue was abandoned by respondent; no findings were made by the Court with regard to the issue; and it was not necessary to the result reached. To these considerations it should also be pointed out that we are dealing with a new taxable period and the principle that the respondent is not forever bound by a previous determination made in a statutory notice of deficiency.

Just as the doctrine of equitable estoppel does not bar the Commissioner from correcting an error in his interpretation of the law, *Automobile Club* v. *Commissioner*, 353 U.S. 180, 183 (1957); *John S. Neri*, 54 T.C. 767 (1970), the abandonment of an issue with respect to certain tax years does not bar the Commissioner from raising the issue again in later years.

Accordingly, we conclude that the doctrines of res judicata and collateral estoppel do not apply to this litigation.

## 2. *Capitalization of Overhead Expenses*

In his notice of deficiency the respondent made adjustments to the company's taxable income for 1965 with the following explanation:

Deductions claimed for expenses in connection with your construction department in the amount of $1,497,639.37, as shown in Exhibit A attached, are not allowed because it is determined that such amounts represent capital expenditures rather than operating expenses. Accordingly, your taxable income is increased in the amount of $1,497,639.37.

The notice of deficiency also covered the year 1966. The adjustment and explanation for that year stated:

Deductions claimed for expenses in connection with your construction department in the amount of $2,238,395.46, as shown in Exhibit D attached, are not allowed because it is determined that such amounts represent capital expenditures rather than operating expenses. Accordingly, your taxable income is increased in the amount of $2,238,395.46.

It is respondent's view that these expenditures are not properly expenses currently deductible and should not be included in cost of goods sold. He contends that they are capital expenditures properly added to the basis of the assets to which the costs are attributable.

The company accounts for its product—beer—using a full cost absorption system. Capital assets are charged with the direct costs involved in placing them in service.

A flow chart of the company's accounting program shows 45 separate accounting departments. For each department there are numerous subledgers which contain the varied accounts necessary to attribute the costs of operating a particular department.

Examination of this chart reveals that the first 36 accounts pertain to the production of beer. These accounts begin with Plant Management progressing from Truck Operating to Water Treatment to Barley Malting, to Brewing and Cellars to Sewage Disposal. These costs all affect inventory and cost of goods sold.

The amounts of direct cost, depreciation, and payroll are derived from the source documents and charged directly to the various departments. Other amounts are allocated to the various departments using varied formulas. Plant Management and Personnel costs are allocated on a payroll basis. Truck-Operating Cost is allocated on the basis of usage as shown on timecards. Plant Protection and Greenhouse costs are allocated directly to Occupancy which in turn is allocated to 14 departments on the basis of net value of depreciable assets as reported for property tax purposes. Costs involved for such items as Water Treatment, Refrigeration, and Sewage Plant are allocated to certain departments on the basis of fixed percentages. Others such as Laboratory costs are allocated on a fluctuating percentage. Engineering, Traffic, and Purchasing are added to administrative which is expensed currently.

Among the 45 accounts there is not a construction department account. The expenditures incurred in this area of the company's activities are charged to various accounts in the Occupancy subledger. The costs gathered in Occupancy are either directly expensed, assigned to inventory, or reflected in cost of goods sold. No part of the Occupancy account is allocated to fixed assets. These departmental costs are allocated directly to the department and indirectly with respect to various self-constructed assets.

The construction personnel employed by the company were not expected to perform repair and maintenance work as a regular part of their duties. Separate maintenance teams were employed to keep the brewery operative. The construction personnel would be detailed to only the major repair projects. To reflect this effort a repair allocation was made in order to remove from the capitalization figures the effect of repair work performed by construction personnel.

The direct costs incurred in the engineering department are allocated to the fixed assets to which they relate. The overhead costs of that department are not allocated to fixed assets.

The purchasing department overhead costs are not allocated to production accounts or to asset accounts. The amounts involved have been expensed.

Respondent argues that the company is utilizing an improper method of accounting in dealing with the actual costs of self-constructed assets. The full cost absorption system utilized by the company to account for the production costs reflects direct, indirect, fixed, and variable costs. With this method and practice of accounting the respondent fully agrees. The difference between a full cost absorption system and a direct costing approach is best seen by viewing what a direct costing system omits. The direct costing approach omits fixed cost from its consideration. The omission of any one of the following costs—direct, indirect, or variable—necessarily results in something less than a direct costing system.

The omission of a required element of cost from a given asset and the concomitant expensing of the item will understate the cost basis of assets for depreciation purposes. The failure to properly treat overhead expenses has a twofold effect on the company's accounting. It tends to overstate the cost of goods sold in a given year. This understates income as well as the cost basis of any assets to which costs are not properly allocated. Where this cost basis is improperly reduced by means of a current deduction, income is improperly reflected. It follows that any distortion in the cost basis of capital assets, normally recoverable by way of depreciation, will affect income in future years.

Section 263(a)(1) of the Code provides, in pertinent part, that no deduction shall be allowed for "any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." Section 1.263(a)–2(a), Income Tax Regs., provides that "the cost of acquisition, construction, or erection of buildings, machinery and equipment, furniture and fixtures, and similar property having a useful life substantially beyond the taxable year" are examples of capital expenditures.

Where a method of accounting used by a taxpayer "does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income." See sec. 446(b).

In the instant case it is a fact that the company has followed its accounting practices for many years. However, the Commissioner may, in the exercise of his discretion, order such a change. The broad powers available to the Commissioner in determining the correctness of a method of accounting have been noted often. See *Automobile Club* v. *Commissioner*, 353 U.S. 180, 189–190 (1957); *Schlude* v. *Commissioner*, 372 U.S. 128 (1963); *S. Garber, Inc.*, 51 T.C. 733, 735–736 (1969). The burden is upon the taxpayer to prove the correctness of his chosen

method of accounting. Conclusionary statements that the method was correct, in long use and often approved, are not sufficient to carry that burden.

We need not decide whether a chosen method of accounting is the *best* method available or whether it is the most widely used method. To do this would put us in the position of attempting to establish "recognized methods of accounting" for various segments of business. We think it is preferable to allow the line of "clearly reflecting income" to be pricked out by adverse parties with vital interests at stake. Our decisions and those of other courts will then provide the means of determining acceptable methods. We recognize, as respondent does, that no "uniform method of accounting can be prescribed for all taxpayers." Sec. 1.446–1(a)(2), Income Tax Regs. This approach necessarily places the burden on the parties to articulate their respective positions with the ultimate burden of persuasion resting with the taxpayer.

The company's argument that its method of treating these overhead costs had been long utilized and tacitly approved can be answered by saying that consistency does not make it right. A failure to clearly reflect income over many years cannot be justified on the grounds of tenure. See *Photo-Sonics, Inc.*, 42 T.C. 926, 935 (1964), affd. 357 F. 2d 656 (C.A. 9, 1966) ("An erroneous method does not become acceptable solely upon the consistent use over an extended period of time."); *Dearborn Gage Co.*, 48 T.C. 190 (1967); *Sam W. Emerson Co.*, 37 T.C. 1063 (1962); *Geometric Stamping Co.*, 26 T.C. 301 (1956); *All-Steel Equipment, Inc.*, 54 T.C. 1749 (1970), affirmed on this issue 467 F. 2d 1184 (C.A. 7, 1972).

The company relies heavily on cases in which the respondent has successfully required the use of full cost absorption accounting. By asserting the fiction that there is no construction department and that respondent has agreed that the accounting method chosen to reflect the cost of its product (beer) does clearly reflect income, the company reaches the conclusion that the full cost absorption method is being correctly used. The fallacy in this position is the assertion that there is no construction department. The scope of this effort, the costs and skills involved, management references to a "construction department," the company policy of self-constructed assets so as to not impede the production of beer, the existence of a separate maintenance unit, and the functional realities of the situation lead us to the conclusion that construction was as much a way of life at Adolph Coors Co. as the production of beer. A failure to have an accounting department for the construction activity will not hide its existence.

The company's construction department is highly diversified. It is largely self-sufficient and self-contained. The machinery and equip-

ment used in its construction effort is owned by it. Expansion of its facilities is accomplished by personnel employed in its construction department. At times the number of employees whose efforts were devoted to construction exceeded the number of employees whose efforts were devoted to the production of beer. In essence, the company's energies are devoted to two activities. One is the production and sale of beer. The other is the construction of new plant and equipment to enable it to produce and sell more beer. General support is needed for the production of new assets probably to a greater extent than general support is needed for the production of beer.

The company cites and relies heavily upon *Fort Howard Paper Co.*, 49 T.C. 275 (1967). Unfortunately for the company, the crucial facts of this case simply do not fit the mold or rationale of *Fort Howard*. The facts of that case are stated in our opinion (49 T.C. at 282 and 285) as follows:

> At least as far back as 1939, petitioner followed a policy of using repair and maintenance personnel during their spare time in the construction, renovation, and repair of fixed assets used by petitioner in its manufacturing operations. At no time were such personnel diverted from regular repair and maintenance activities to work on such self-constructed assets.

> At all times the size of petitioner's repair and maintenance staff was determined exclusively by its need for the continuous operation of its regular producing equipment. No special tools or machinery were acquired for use by such personnel in their activities on self-constructed assets. Respondent does not contend that petitioner maintained a larger than necessary repair and maintenance staff as a cover for its self-construction activities, and, indeed, there is no evidence in the record before us to support any such conclusion.

> At this point, it is useful to recall the salient facts regarding petitioner's policy with respect to self-constructed assets. Petitioner did not in any way augment its personnel to construct these assets. It relied entirely on its repair and maintenance staff to do this work and then only during "slack" or "idle" time, so that the normal flow of production activities was in no way affected. Thus, petitioner's policy achieved a "double duty" objective. In a very real sense, petitioner killed two birds with one stone. There is nothing in the record before us which indicates that there was any increase in overhead costs which could be directly identified with the self-constructed assets. * * *

In *Fort Howard*, the Commissioner took the position that the paper company was employing the prime cost method of accounting for its self-constructed assets and that the full absorption cost method was the proper method. The paper company contended that it was employing the incremental cost method of accounting and that such a method was acceptable for commercial accounting purposes.

Since this Court decided in *Fort Howard* that the costs which the Commissioner sought to capitalize were largely costs that would have been incurred in any event, the method of accounting was undoubtedly a consideration secondary to the factual distinction. In *Fort Howard*,

the crucial distinction is the "idle time" factor. If an employee is in any event essential to the current production effort, but that employee has spare time and to conserve against the waste of his time he is placed in the construction of an asset during slack periods which in no way interferes with his maintenance functions, then there is no increment or variance in costs above what would have been incurred in any event had not the construction taken place. That is the rationale of this Court in *Fort Howard*. Those facts are clearly distinguishable from the employees in the construction department and the engineering department at Adolph Coors Co., and the costs of running that massive construction effort. Here, by contrast, we are concerned with the increment to which costs vary because of in-house construction over what such costs would have been had the new assets been acquired by contract from outside sources.

Since *Fort Howard* largely involved labor costs which would have been incurred in any event, there no doubt were little, if any, variable costs involved. Hence, the difference between prime costing and incremental costing would seemingly have been insignificant as applied to the facts of that case in reaching a dollar result. That is quite different in the case of Adolph Coors Co. since essentially all of the costs involved, other than direct costs, are variable costs. To a limited extent this case involves what would be viewed as fixed costs or period costs, if we were concerned with the beer production effort alone. However, by using the company's own figures, such as those costs allocated to the expense account "Payroll Taxes, Capital Accounts," it becomes readily apparent that the costs of certain "fixed overhead" type activities vary considerably when in-house construction of such massive proportion is undertaken and, conversely, such costs are not nearly so "fixed" in amounts as they would have been had these activities been concerned with beer production alone.

Unlike *Fort Howard*, there would not appear to be any major differences between an application of the "incremental cost" method and the "full cost absorption" method in the instant case since the costs involved here, other than direct costs, are primarily variable costs with which incremental costing is concerned and not nonvariable or fixed costs, the addition of which is the progression from incremental costing to full absorption costing. The important step involved in the instant case is between prime costing, which the company's system is intended to accommodate for self-constructed assets, and incremental costing.

Finally, an application of the accounting principles enunciated by the authorities cited in *Fort Howard Paper Co.*, *supra* at 285, to the facts of this case clearly reveals that the method used by the company in accounting for the cost of its self-constructed assets is not accepted for purposes of commercial accounting.

We think respondent has not abused his discretion in requiring a change in the company's method of accounting for self-constructed assets. As our previous discussion indicates, the method of accounting used by the company fails in two major respects to clearly reflect income and is therefore erroneous. First, it causes a distortion of current income by causing cost of goods sold to be overstated in the current year and, in a corresponding amount, causes the cost of self-constructed assets to be understated. Secondly, it causes a distortion of the current year's income to the extent that capital construction costs are deducted as current expense. The cumulative effect is to take as current expense or as a part of cost of goods sold amounts which should be capitalized and recovered through depreciation in later years. This will cause the income in future years not to be clearly reflected. Moreover, from the standpoint of commercial accounting, the practice of capitalizing only certain direct costs of new capital construction is not an acceptable method of accounting in the unique factual setting of this case, and is unacceptable for Federal income tax purposes. See and compare *Ben Perlmutter*, 44 T.C. 382 (1965), affd. 373 F.2d 45 (C.A. 10, 1967).

In our opinion there is no justification in either accounting theory or in Federal tax law for the company's failure to absorb costs in assets to which the costs unquestionably relate. Had Adolph Coors Co. procured its capital additions by contract from an outside source, included in the cost it would have incurred would be all of the costs we are concerned with here plus a profit to the builder. Obviously, the acquiring of capital additions, whether by purchase or by self-construction, is appropriate, if not vital, to the company's continued expansion, but this fact does not cause the cost of these capital additions to be deductible in the year acquired. And it is unrealistic to suggest that by in-house construction the company can, for Federal tax purposes, properly expense all costs of capital construction other than certain direct costs. This would not only offend the provisions of section 263 but would also distort annual accounting and income for Federal tax purposes. See and compare *Southern Natural Gas Co.* v. *United States*, 412 F. 2d 1222, 1265 (Ct. Cl. 1969).

The company has made a rather general, hit-and-run attack on respondent's determination as being arbitrary and capricious. If the respondent's determination is arbitrary, it is clear that the presumption of correctness disappears. It is our view, however, that the company's evidence herein does not establish arbitrariness. At most, it raises suspicion, and that has been dispelled by respondent. Although the determination may not "rise to the dignity of glittering perfection," it nonetheless has a rational basis and is therefore not arbitrary.

### 3. *Section 481 Adjustments*

Section 481(a) of the Code provides that where taxable income for any taxable year is computed by means of a method different from that utilized to compute taxable income for a preceding taxable year then—

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.

Section 1.481–1(a)(1), Income Tax Regs., amplifies the meaning of "a change in method of accounting" in the following terms: "A change in method of accounting to which section 481 applies includes a change in the over-all method of accounting for gross income or deductions, or a change in the treatment of a material item." Section 1.446–1 (e)(2)(ii)(a), Income Tax Regs., likewise provides that a change in the method of accounting includes both a change in the overall method of accounting for gross income or deductions and "a change in the treatment of a material item."

Respondent argues that the company has consistently failed to add to the cost basis of various self-constructed assets certain costs incurred in placing those assets into use. This failure in accounting methodology and practice has resulted in the deductibility of substantial amounts of money in the year incurred.

For the purposes of section 481, "method of accounting" includes, at least, a change in the treatment of a recurring material item. *Shepherd Construction Co.*, 51 T.C. 890, 898 (1969); *Fruehauf Trailer Co.*, 42 T.C. 83, 104 (1964), affd. 356 F. 2d 975 (C.A. 6, 1966), certiorari denied 385 U.S. 822 (1966); *Electric & Neon, Inc.*, 56 T.C. 1324 (1971). Even if a practice of accounting is erroneous, it may nonetheless be a method of accounting. *Fruehauf Trailer Co., supra*.

In *Peoples Bank & Trust Co.*, 50 T.C. 750, 756 (1968), affd. 415 F. 2d 1341 (C.A. 7, 1969), this Court said:

The term "method of accounting" includes the accounting treatment of any item. Sec. 1.446–1(a)(1), Income Tax Regs. The treatment initiated by respondent was a change in the treatment of a material item, thus constituting a change in petitioner's method of accounting. [Citation omitted.]

No argument is made by the company that the item involved is not material. Respondent has asserted a "year of change" increase in taxable income of $7,042,325.93 [5] for 1965. The amounts capitalized for the years 1965 and 1966 are $1,497,639.37 and $2,238,395.46, respectively.

---

[5] This reflects the limitation imposed by sec. 481(a)(2).

Since the respondent initiated this change in method of accounting the adjustment in taxable income made for the "year of change" will include only those years to which the 1954 Internal Revenue Code applies. For the years since 1954 the improperly deducted capital asset costs must be restored. This sum will be added to the basis of the assets and will be subject to depreciation thereafter. Obviously, if the amount of previously deducted costs were only added to the basis of the assets and thereafter recovered under various depreciation methods, a double benefit would accrue to the company. The aversion to a double deduction on the part of respondent is understandable. The statute, however, bars pre-1954 years from the applicability of the adjustment. For those years a possible double deduction exists. This is understood and accepted by respondent. See secs. 1.481–1(a)(2), 1.481–1(c)(3), and 1.481–3, Income Tax Regs.; *Fruehauf Trailer Co., supra*, to which the respondent has acquiesced.

Respondent has determined that the company incurred $9,580,728.91 in additional capital construction costs during the years 1954 through 1964. From this he has deducted allowable depreciation of $1,700,-597.17 to arrive at the additional basis as of January 1, 1965, of $7,880,131.74.

In the pre-1954 years the respondent has determined that additional capital construction costs of $2,067,370.35 were incurred. Pre- and post-1954 depreciation totals $1,328,916.67, resulting in an additional basis as of January 1, 1965, of $738,453.68.

Section 481(a)(2) bars the addition to income in 1965 of $1,576,-259.49 which is computed by subtracting the pre-1954 capital construction costs ($2,067,370.35) that were expensed. This "windfall" must be subtracted from the gross amount capitalized for both pre- and post-1954 ($8,618,585.42), resulting in the section 481 adjustment of $7,042,325.93.

The company has argued that the section 481 adjustment is subject to possible error and as such is arbitrary and capricious. We reject this argument.

We conclude that respondent's change of the company's consistent, but erroneous, treatment of a recurring material item is correct, and that the adjustments made necessary by sections 446 and 481 of the Code were correctly applied in 1965, the year of change.

### 4. *Inventory Adjustments*

The company asserts that it has been prejudiced by respondent's inventory adjustments. Adjustments to inventory occurred because of respondent's capitalization of that portion of construction costs absorbed in the various inventories. Closing inventory for 1965 was ad-

justed to exclude therefrom amounts capitalized for that year alone to the extent that such costs were included in closing inventory. The closing inventory for 1965 was carried forward to reflect the correct opening inventory for 1966. Closing inventory for 1966 was adjusted to exclude construction costs included therein to the extent that such costs were capitalized by respondent for the year 1966. The difference between the adjusted opening inventory for 1966 and the adjusted closing inventory for 1966 represents the net cost of goods sold adjustment for 1966. There were no specific adjustments to inventory prior to the adjustments to closing inventory for 1965. However, the failure of respondent to make such adjustments is to his prejudice and not to the prejudice of the company.

Respondent's exclusion of construction costs from inventory reduced the unit cost of inventory units on hand at the close of 1965 and 1966. The reduced unit cost was multiplied by the number of units on hand to arrive at the closing inventory for each year. In computing inventory, the number of units used by respondent is the same as the number of units used by the company in valuing its closing inventory. Only the unit cost of certain inventory groupings was corrected, but the number of units on hand at the close of each year was in no way adjusted.

The adjustments to inventory do not modify the company's full cost absorption method of accounting for inventory. These adjustments are premised on respondent's position that certain fixed-asset costs, as opposed to production costs, were erroneously entered into manufacturing costs. Adjustments to inventory are merely ancillary to an attempt to segregate capital expenditures from production costs.

In connection with the company's cost absorption system, a portion of its capital construction costs were through allocation and reallocation improperly absorbed in cost of goods sold. This causes cost of goods sold to be overstated, resulting in gross profit on sales being understated and ultimately causes taxable income to be understated. However, for practical purposes, it matters not on an annual basis whether the capital costs are included in cost of goods sold or current expense with the exception of the effect these costs have on the various inventories. Other than with respect to inventories, production costs are in effect expensed during the year the inventory is either consumed or sold in much the same manner as nonproduction costs are expensed.

Closing inventory is, in a sense, a deferral of expense to a subsequent accounting period when that inventory is either consumed or sold. This is necessary to properly reflect income on an annual basis. Hence, the ultimate effect of respondent's disallowance and capitalization is to reduce inventories to the extent that capital construction costs were improperly included therein.

The company claims that the respondent erred in not adjusting malt pellet inventory. We note, however, that any adjustment to malt pellet inventory is insignificant because of the small amount on hand at the end of the year coupled with the slight amounts of capital construction costs absorbed in malt pellet inventory.

In these circumstances we conclude that Adolph Coors Co. is not prejudiced by respondent's inventory adjustments.

### 5. *Land Development Costs*

In a period of 2 years the company expended $209,368.56 in relocating 32d Avenue, moving land fill to the East Springs area, and straightening a portion of Clear Creek. It deducted the expenses in the years incurred as ordinary and necessary business expenses. Respondent determined that the expenditures are nondeductible and should be added to the company's basis in the land.

The company contends that the expenses constitute "deductible business expenses as reported, rather than capital expenditures." To the contrary, respondent points to section 263(a)(1) which provides that no deduction shall be allowed for "any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." Respondent asserts that "the expenditures increased the value of the property."

We do not accept as realistic the company's assertion that it was neutral with respect to the relocation of 32d Avenue. We think the evidence shows the obstacle the road presented to the industrial development plans of the company. The company was constantly pressed to increase its capacity. It enjoyed a rising demand for its product and wished to expand its sales. Whether or not the company made the initial overture to the board of supervisors, the minutes of the supervisors indicate that the company presented its plans for such relocation and the supervisors deferred immediate action until their staff was able to prepare studies and contact affected individuals. The road was relocated by the company and, after completion and dedication, the company received title to the land previously utilized by the road.

The cost/benefit analysis that was done with respect to the industrial development in terms of capital expenditures and market penetration must have convinced the company to proceed with its development.

The rechanneling and diking of Clear Creek was an investment in security for the new can plant to be built in the East Springs area. This is to be the industrial area sufficient for "the all time needs of the company." The investment in the stream rerouting and diking must be viewed as a capital item and not a deductible expense.

In its brief the company cites *Converse* v. *Earle* (D. Ore. 1951, 43 A.F.T.R. 1308, 51–2 U.S.T.C. par. 9430). That case held that $9,031.45 spent to build a logging road was an ordinary and necessary business expense and currently deductible. The decision contained no discussion and no authorities were cited. The *Converse* case was later cited and followed in *Regan* v. *United States* (D. Ore. 1967, 20 A.F.T.R.2d 5759, 67–2 U.S.T.C. par. 9728). On the appeal of the *Regan* case to the Ninth Circuit the error was rectified. See *United States* v. *Regan*, 410 F.2d 744, 746 (C.A. 9, 1969), certiorari denied 396 U.S. 834 (1969), where the Court of Appeals said: "Are expenditures for building access roads capital expenses? We think they are. * * * We disapprove of anything in *Converse* and *Watts* which may be contrary to our views herein expressed." See also *Casey* v. *United States*, 459 F.2d 495, 496 (Ct. Cl. 1972), involving the same partnership as *Regan*. The Court of Claims, in holding that the road expenditures were capital items, said:

The above Ninth Circuit decision [*United States* v. *Regan, supra*] not only reversed the decision below [*Regan* v. *United States, supra*], but it went further and disapproved anything contrary in *Watts* v. *Erickson*, 10 A.F.T.R.2d 5832 (D.C., Ore., 1962), and *Converse* v. *Earle*, 43 A.F.T.R. 1308 (D.C., Ore., 1951). Plaintiffs herein rely very much on these two cases, but *Converse* and *Watts* are no longer the law in the Ninth Circuit.

We hold that the expenditures to shape and mold the land resulted in an improvement in the land itself and must be capitalized.

### 6. *Paving and Fencing Costs*

This is an often litigated issue in which the line of demarcation between a repair (currently deductible) and a capital expenditure (depreciable) is a fine one.

In *Plainfield-Union Water Co.*, 39 T.C. 333, 338 (1962), this Court indicated that the proper test for distinguishing a repair from a capital expenditure is "whether the expenditure materially enhances the value, use, life expectancy, strength, or capacity as compared with the status of the asset prior to the condition necessitating the expenditure." See also *Illinois Merchants Trust Co., Executor*, 4 B.T.A. 103 (1926), where we looked at the purpose for which an expenditure was made. The approach was to distinguish between a repair made to repair or mend and a replacement which connotes a substitution.

The company claims that materials aggregating $6,997.20 for 1965 and $3,351.23 for 1966 were "incidental repairs" which did not prolong the life or add to the value of the roads, the parking lot, or the fences.

Respondent, on the other hand, contends that the costs for such items are capital expenditures, primarily because the company has not established their deductibility.

For the year 1965 we hold that the $2,420.80 paid to Asphalt Paving Co. for the application of slurry seal to the employees' parking lot has all the appearances of a make-do repair and is deductible. The practice of putting a slurry seal—a watery mixture of insoluble matter—on a parking lot is not a replacement of the paving material. It is a make-do, recurring item. It is at best a cosmetic rehabilitation with no structural value. But all of the other costs, particularly those paid to Lifetime Fence Co. ($2,379.36) which were for the replacement of fences and fence posts, are capital expenditures. The same is true for the asphalt paving, which is not merely a repair.

For the year 1966 respondent's capitalization of paving costs is a specific adjustment in the amount of $7,600 pertaining to the amount paid Asphalt Paving Co. for the paving of four areas at the brewery. The company's chief accountant testified that $4,248.76 of that amount was for new paving pertaining to four areas at the brewery which amount should be capitalized; but that $3,351.23 was for repairs. He failed to give any indication of the repairs involved. Hence we sustain respondent's adjustment in its entirety.

### 7. *Investment Credits*

In his notice of deficiency respondent disallowed various items of investment credit. At the time of trial five items for which the credit was claimed had not been resolved. Concessions following the trial have resulted in three items remaining in controversy.

The material facts relating to cost, date of expenditure, and useful life are not at issue. The only question is whether the components qualify as "section 38 property" for the years involved.

A. *Duct work.*—It is the duct work described as 3 to 5 feet thick, 6 to 10 feet wide, and approximately 100 feet long that is in question.

Section 38 of the Code provides for the allowance as a credit against tax for qualified investments in property. Section 48(a)(1) defines the term "section 38 property" to mean:

(1) IN GENERAL.—Except as provided in this subsection, the term 'section 38 property' means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, * * *

The term "tangible personal property" is defined in section 1.48–1(c), Income Tax Regs., as:

any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures). * * * Tangible personal property includes all property (other than structural components) which is contained in or attached to a building. * * *

Respondent argues that none of the components at issue falls within the definition of "tangible personal property." The regulations permit property (other than a building or its structural components) to qualify as "section 38 property." The requirement for such qualification is that the property be used as an integral part of the manufacturing or production process. Sec. 1.48–1(d), Income Tax Regs. Respondent agrees that the components are part of the facilities used as an integral part of the company's manufacturing process. It is the parenthetical phrase (other than a building or its structural components) on which respondent focuses. If the items are buildings or structural components thereof, they are excluded from the purview of section 38 property.

Section 1.48–1(e)(2) includes as a "structural component" the duct work associated with a central air-conditioning system. It speaks of an air-conditioning system. The apparatus here involved is just such a conditioning system. The regulation excludes those structural components the sole justification of which is the necessity to meet temperature or humidity requirements essential to the processing of foodstuffs.

The testimony of the expert witness for each side was of little value. Each witness stated that the property was or was not section 38 property depending upon his affiliation with the parties. It is our view that the duct work (specifically listed as a structural component) cannot be separated from this category under the exclusion for essential temperature and humidity control apparatus.

B. *Saw room.*—This room is an area within the confines of the bottle-packaging plant. It contains apparatus used in removing the tops of cartons carrying reusable bottles. The saw room itself is not within the exclusion contained in section 1.48–1(e) of the regulations which attempts to define buildings and their structural components. This exclusion reads as follows:

Such term [building] does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) an enclosure which is so closely combined with the machinery or equipment which it supports, houses or serves that it must be replaced, retired, or abandoned contemporaneously with such machinery or equipment, and which is depreciated over the life of such machinery or equipment.

The room itself is not an item of machinery such as a wind tunnel. Nor is it so closely entwined with the cutting machinery that its useful life

is mirrored by the useful life of the equipment it encompasses. We think the saw room is different from the movable, replaceable room partitions accorded section 38 treatment. *Minot Federal Sav. & Loan Association* v. *United States*, 313 F. Supp. 294 (D.C.N.D. 1970), affd. 435 F. 2d 1368 (C.A. 8, 1970). To read the *Minot* case as supporting the view that the "intent of the investment credit statutes was to include all tangible property as qualifying for the credit excepting land and improvements" is clearly wrong.

C. *Valve-testing room.*—This workshop area was provided for the purpose of performing maintenance and repair facilities needed for the valves used in the production of beer. This room obviously provides working space. It is excluded by the terms of the regulations from section 38 status. See sec. 1.48–1 (e) (1), Income Tax Regs.; *Robert E. Catron*, 50 T.C. 306, 312–313 (1968).

Accordingly, we hold that the company's duct work, the saw room, and the valve-testing room do not qualify as section 38 property and therefore the company is not entitled to the claimed investment credits on such property.

### 8. *Social Club Dues*

Respondent disallowed deductions of $3,142.60 in 1965 and $4,442 in 1966 claimed by the company as business expenses. Such disallowance also resulted in a determination that William and Joseph Coors received constructive dividend income.

Throughout these proceedings the company has maintained that the respondent has permitted it to take deductions for club dues for many years. From this tacit approval, the company draws the inference that what has been accepted in the past must be accepted for the present and the future. That is incorrect. It is firmly established that the Commissioner is not precluded from determining that a taxpayer is not entitled to a deduction in the amount claimed in succeeding taxable years, even though he previously approved a like deduction in an earlier year. See and compare *Dinkins* v. *Commissioner*, 378 F. 2d 825 (C.A. 8, 1967), affirming 45 T.C. 593 (1966) ; *Dixie Furniture Co.* v. *Commissioner*, 390 F. 2d 139 (C.A. 8, 1968), affirming a Memorandum Opinion of this Court; *Estate of Goodall* v. *Commissioner*, 391 F. 2d 775, 783 (C.A. 8, 1968). Nor is it correct to assert that the Commissioner's acquiescence in prior tax returns and the treatment of given items thereon will operate as an admission against interest by the respondent. See *Wiles* v. *United States*, 312 F. 2d 574 (C.A. 10, 1962). A prior determination cannot serve to relieve a petitioner of his burden of proving error in the Commissioner's present determination. See *Walker* v. *Commissioner*, 362 F. 2d 140 (C.A. 7, 1966), affirming a Memorandum Opinion of this Court.

The evidence shows that the company has maintained these various club memberships for many years. The evidence also shows that the respondent has not disallowed all club expenses. The entertainment expenses charged to the company on the basis of the notations made on the statements by the principal officers were uniformly allowed. Respondent also allowed a deduction for the membership dues of Adolph Coors, Jr., in the Lakewood Country Club.

The company asserts that the clubs sell petitioners' products; the memberships have been maintained for several years; business associates utilize the facilities; and the company holds some business functions there.

The issue is whether the company's payment of annual dues incident to the memberships of its two principal officers in the social clubs is deductible as an ordinary and necessary business expense under section 162 of the Code. More directly involved is section 274 and the implementing regulations which provide that social club dues are not deductible at all unless the facility is used primarily for business purposes during the taxable year, and that if it is used primarily for business purposes, then only that portion of the membership dues established as being directly related to the active conduct of a business during the year is deductible. Section 274 of the Code sharply limits entertainment expense deductions made after 1962 even though they might otherwise qualify under section 162. See secs. 274(a)(1)(B) and 274(d)(2). Congress made the conscious decision that more shall be required to obtain an entertainment expense deduction than merely asserting that the expenditure was an ordinary and necessary item incurred in the taxpayer's trade or business. See *William F. Sanford*, 50 T.C. 823 (1968), affirmed per curiam 412 F. 2d 201 (C.A. 2, 1969), certiorari denied 396 U.S. 841 (1969). Uncorroborated oral testimony is insufficient to entitle one to the deduction. *John L. Ashby*, 50 T.C. 409 (1968); *Charles A. Bane*, T.C. Memo. 1971–31, affirmed per curiam (C.A. 7, 1972). Cf. *La Forge* v. *Commissioner*, 434 F. 2d 370 (C.A. 2, 1970), reversing in part and remanding 53 T.C. 41 (1969).

Under section 274(a)(1)(B), as amplified in section 1.274–2(e)(4)(i), Income Tax Regs., it is the actual use of the social club which is determinative as to the primary-use test as opposed to either its availability for use or the member's principal purpose in joining the club. Section 1.274–2(e)(4)(i) further provides that "objective rather than subjective standards will be determinative" of primary use.

Section 1.274–2(e)(4)(i) provides that in determining the nature of each use the factors to be considered include the frequency and duration of use for business purposes as compared with other purposes, and the amount of expenditures incurred during use for business compared with the amount of expenditures incurred during use for other

purposes. However, that section goes on to state that no one of the standards is exclusively determinative.

In the case of the three social clubs of which Joseph Coors was a member during 1965 and 1966, an objective application of the evidence to the primary use of the facility test is conclusive of the fact that none of the objective standards provided by section 274 and its implementing regulations is met. Since the primary-use requirement has not been satisfied, we think no portion of the social club dues paid by the company on behalf of Joseph Coors during 1965 and 1966 is deductible as an ordinary and necessary business expense to the company during each of those years.

In the case of the five social clubs of which William K. Coors was a member during 1965 and 1966, the evidence supports the fact that, from a standpoint of "the dollar test" and "the times of use test" in arriving at primary use, the University Club and the Denver Club were not primarily used for business purposes during the years 1965 and 1966. The same is true of the Denver Country Club for 1966. Since the primary-use requirement has not been satisfied, we think no portion of the dues paid by the company on behalf of William K. Coors is deductible with respect to his University Club and the Denver Club memberships for 1965 and 1966 and his Denver Country Club membership for 1966.

William K. Coors' membership in the Denver Country Club was used 1 time for business purposes and 38 times for personal purposes during 1965. However, the expenditure for the one occasion of business use is $814.18 and the aggregate of the expenditures in connection with the 38 times of personal use is $359.58. As previously indicated, there is no one particular test that satisfies the primary-use requirement to the exclusion of other objective standards. However, where a facility was used 38 times for personal reasons and only 1 time for business reasons, it is our view that the primary use of the facility was not for business purposes. Thus, we conclude that this item does not constitute expense deductible by the company during 1965.

The substantiation required by section 274(d)(2) to establish that a facility was used primarily for business purposes is most precise. *Otho B. Ross, Jr.*, T.C. Memo. 1970–110. It specifically requires adequate records or corroborated verbal statements as to use. In the case of William K. Coors' membership in the Hiwan Golf Club and the Garden of the Gods Club for 1965 and 1966 the substantiation as to use as required by section 274(d)(2) is wholly lacking. Sections 274(a)(1)(B) and 274(d)(2) make the dues expense of these two clubs unavailable as a deduction to the corporation in 1965 and 1966 in the absence of precise proof as to the primary use for business purposes. The company has failed to do this.

We hold that the company has not established that the social clubs here involved were used during 1965 and 1966 primarily for the furtherance of its business. This is an indispensable requirement of section 274(a) (1) (B) if the social club membership dues are to be allowed as an ordinary and necessary business expense. Accordingly, it follows that such amounts are not deductible by the company in 1965 and 1966.

Club dues paid by a corporation for the personal benefit of its shareholders constitute dividend income. *Commissioner* v. *Riss*, 374 F.2d 161, 170 (C.A. 8, 1967). A substantial amount of the stock of Adolph Coors Co. is owned either directly or beneficially by William and Joseph Coors. The social club dues at issue here were paid by the company primarily for the *personal* benefit of William Coors, its president, and Joseph Coors, its executive vice president, and as such constitute constructive dividend income to them, as follows:

|  | 1965 | 1966 |
|---|---|---|
| William Coors | None | $1,643 |
| Joseph Coors | $1,504 | 1,592 |

See *Louis Greenspon*, 23 T.C. 138 (1954), affirmed on this issue 229 F.2d 947 (C.A. 8, 1956); *American Properties, Inc.*, 28 T.C. 1100 (1957), affirmed per curiam 262 F. 2d 150 (C.A. 9, 1958); *Irving Sachs*, 32 T.C. 815, 820 (1959), affd. 277 F. 2d 879 (C.A. 8, 1960).

The company offered no evidence that such amounts were paid for the benefit of William and Joseph Coors in their capacity as employees. Consequently, we are unable to find that the amounts constituted additional compensation to them and were deductible by the company.

### 9. *Payments Made to Influence Legislation*

For each of the years 1965 and 1966 the company claimed deductions for "dues and subscriptions" paid to certain organizations in the total amounts of $450 and $1,350, respectively. Respondent determined that these were payments to organizations the purpose of which is to influence legislation and for this reason the payments do not constitute ordinary and necesary business expenses. Payments made to influence legislation are not deductible. See sec. 1.162–20, Income Tax Regs.; *Cammarano* v. *United States*, 358 U.S. 498 (1959).

The company introduced no evidence on this issue. It has failed to carry its burden of proof. We therefore sustain respondent's determination.

### 10. *Aspen Condominium*

As to this issue, we must decide whether William Coors' condominium at Aspen, Colo., was held for the production of income within

the purview of section 212 of the Code. The petitioners contend that it was so held. Respondent contends that it was not because the petitioners had no profit-seeking motive.

William and Phyllis Coors own a condominium unit in a multiple-unit building located at Aspen. Their cost basis in the condominium and its furnishings is $41,897. On their 1966 income tax return they reported rental income in the total amount of $788. They claimed a deduction for depreciation in the amount of $2,039 and other deductions of $1,241, resulting in a net loss of $2,492.

Petitioners contracted with an Aspen rental agency to rent and manage the apartment in 1966. The agency is paid a substantial fee to care for the apartment and, in addition, receives a commission of 20 percent of the rental proceeds. Each summer the rental agency furnishes the petitioners with an annual occupancy schedule; they block out and reserve a week in the spring and a week in the winter for personal use of the apartment; and the rental agency attempts to rent the apartment for the remainder of the year.

If the "predominant purpose" and use of the property was for recreation, a hobby, or some other nonprofit motive, and not to derive income therefrom, then no deductions are allowable. Sec. 1.212–1(c), Income Tax Regs. In this connection it is well settled that the absence of a profit is not determinative, but the use of the property should be of such a nature that in good faith the taxpayer genuinely expected or intended to make a profit. See *Henry P. White*, 23 T.C. 90, 94 (1954), affd. 227 F. 2d 779 (C.A. 6, 1955) ; *Margit Sigray Bessenyey*, 45 T.C. 261 (1965), affd. 379 F. 2d 252 (C.A. 2, 1967). The issue is factual, and we find on this record that the petitioners did have a profit-seeking motive and thus held the property for the production of income in 1966. That was the first year of attempted rental and it is understandable that the market was slow. It is significant that it was held out for rental about 95 percent of that year.

We think *Carkhuff* v. *Commissioner*, 425 F. 2d 1400 (C.A. 6, 1970), affirming a Memorandum Opinion of this Court, is distinguishable on its facts. In that case there was substantial personal use of a Sea Island cottage by the taxpayers during peak rental periods. Under the circumstances the taxpayers failed to prove they had a profit motive.

Accordingly, we hold for the petitioners on this issue. In doing so, we note that the provisions of section 183 and the regulations thereunder do not apply to the year 1966.

## 11. *Bad Debt*

The facts pertaining to this issue are incomplete, unclear, and conflicting. However, it appears that Joseph Coors and two other individ-

uals entered into a venture to perfect and market an audiovisual communication device. One of them (Flury) borrowed money from a bank. Joseph Coors guaranteed the loan. The venture was unsuccessful. Flury defaulted on the bank loan and disappeared. Joseph Coors, as guarantor, paid off the loan of $2,167 in 1965. Respondent determined that the debt was a nonbusiness bad debt instead of a business bad debt, as reported by the petitioner.

Petitioner argues that the payment in discharge of his obligation as a guarantor of the loan constitutes a business bad debt deduction under section 166(f) of the Code.

In order for a bad debt to be deductible under section 166(f) the elements to be satisfied are: (1) The guarantor must not be a corporation; (2) the guaranteed debt must not be that of a corporation; (3) the loan proceeds must be used in the principal debtor's (borrower's) trade or business; and (4) the principal's debt to the lender must be worthless at the time the guarantor makes good on his obligation and pays the lender.

The facts relative to this particular debt show that there was a noncorporate guarantor who guaranteed a noncorporate debt which at repayment was in fact worthless. On brief the respondent questions only "Whether the loan proceeds were used by Flury in *his* trade or business." The issue, as viewed by respondent, is whether or not the borrowed funds were utilized in the borrower's trade or business. He argues that it is the utilization and not the relationship giving rise to the guarantee that determines the tax treatment. Petitioner cites *Axelrod* v. *Commissioner*, 320 F. 2d 327 (C.A. 6, 1963), reversing 37 T.C. 1053 (1962), to the effect that it is the "business relationship" that brings the debt within the provisions of section 166(f).

The exact nature of the business engaged in by Paul Flury and the nature of his relationship with either Joseph Coors or Interpretor Corp. is not clear. In our opinion in *Adolph Coors Co.*, T.C. Memo. 1968-256, we observed that "Flury worked for Joseph Coors in some way." During the present trial Joseph Coors testified that at the time he enlisted the aid of Flury, he (Flury) "was working for our company, Coors Porcelain Company at that time." From this testimony it appears that Flury was an employee of Coors Porcelain Co. at the time of his disappearance and that his involvement with the development of the language machine was an incidental activity outside of his full-time employment at Coors Porcelain Co. At another place in the record Joseph Coors indicated that his association with Flury was something akin to a joint venture. Interpretor Corp. was apparently formed in 1964. Whether Flury was a part-time employee of that

412

corporation is not clear. But we know that the patent on the language machine was granted to Flury and assigned by Flury to the Interpretor Corp. Joseph Coors held stock in the Interpretor Corp.

The facts in *Axelrod* v. *Commissioner, supra,* are in all vital respects different from the unclear and conflicting facts herein; therefore, we regard *Axelrod* as distinguishable. A going business was involved there and the loan proceeds were used to allow that going business to continue. By contrast, the "business relationship" here has not been shown. In view of the confused and irreconcilable testimony regarding this matter, the business, if any, of Flury (the borrower) is not established. The language machine was never perfected and there was no going business to continue.

Even if Flury was at least engaged in the trade or business of developing the patent on the language machine, the petitioner has failed to prove that the borrowed money was used in the business. Such evidence could have been produced by Joseph Coors. Nothing in this record shows a proximate link between the loan and its use in any trade or business.

In these circumstances we conclude that Joseph Coors is only entitled to a nonbusiness bad debt deduction for the payment of his guarantor obligation.

To reflect the various concessions made by the parties and our conclusions with respect to the disputed issues,

*Decisions will be entered under Rule 50.*