T.C. Memo. 1997-449


UNITED STATES TAX COURT


INTERHOTEL COMPANY, LTD., TORREY HOTEL ENTERPRISES, INC., TAX
MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No.  13017-95.                    Filed September 30, 1997.


        M and THEI were partners in IHCL.  IHCL was formed
in 1981 to hold interests in both PGL and PLH, which were
partnerships formed for the purpose of constructing,
owning, and managing separate hotel towers of a resort
complex located adjacent to the then-unbuilt San Diego
Convention Center.  IHCL's partnership agreement provided
that upon liquidation, the liquidation proceeds would be
distributed only to those partners having positive
capital accounts.  IHCL's partnership agreement did not
require the partners to restore any deficits in their
capital accounts upon liquidation of the partnership.
        In 1985, D agreed to invest $19.8 million in IHCL in
exchange for a 15-percent interest in IHCL, together with
a special allocation of 99 percent of IHCL's income and
losses.  Upon D's entry as a partner in IHCL, M withdrew
as a partner of IHCL, and THEI's interest in IHCL was
reduced.

D encountered financial difficulties. In 1987, the special allocation of gains and losses to D was terminated. Thereafter, the gains and losses of IHCL were allocated to THEI and D pro rata in accordance with their partnership interests. Following this allocation, a substantial deficit balance existed in THEI's partnership capital account.

On June 20, 1991, M purchased D's interest in IHCL and thereafter succeeded to D's then-positive partnership capital account of $14.8 million. At that time, THEI had a negative $5.9 million partnership capital account.

Upon M's reentry into IHCL, IHCL's partnership agreement was amended to provide that IHCL's income would be allocated first to partners having negative capital account balances and then to the partners pro rata. No amendment was made to IHCL's partnership agreement with respect to the allocation of losses, distributions of cash-flow, or liquidating distributions.

IHCL's 1991 information return reported an allocation of 99 percent of IHCL's income to D up to June 20, 1991, and thereafter an allocation of 100 percent to THEI. Respondent determined that 99 percent of IHCL's income after June 20, 1991, should be reallocated to M as D's successor in IHCL.

Held: Respondent's reallocation of 99 percent of IHCL's income to M for the period in issue is sustained. See sec. 704(b), I.R.C.

J. Clancy Wilson, for petitioner.

Paul B. Burns and Gretchen A. Kindel, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, Judge: Respondent issued a notice of final partnership administrative adjustment (FPAA) on April 11, 1995. In relevant part,[1] respondent proposed increasing by $814,296 the

---

[1] In addition to the amounts at issue, respondent also determined that Interhotel Co., Ltd., the partnership whose
(continued...)

reported distributive share of allowable ordinary income of Douglas F. Manchester (Mr. Manchester) with respect to Interhotel Co., Ltd. (IHCL), a California limited partnership, for the taxable year 1991. As a result of this proposed increase, respondent determined that Mr. Manchester, as a partner of IHCL, should also be subject to adjustments for alternative minimum tax and tax preference items totaling $23,490. The issues for decision are whether IHCL's allocation of the partnership items at issue either has substantial economic effect or is consistent with the partners' interests in IHCL. For the reasons set forth herein, our responses to both inquiries are in the negative. Therefore, we sustain respondent's reallocation.

Unless indicated otherwise, all section references are to the Internal Revenue Code as in effect for the year under consideration. All Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

(...continued)
earnings are at issue here, had ordinary income from its business activities in the amount of $404,950, not $355,745 as reported on its Form 1065 for taxable year 1991. In addition, respondent determined that the partnership was entitled to "Other Deductions, Professional Fees" in the amount of $2,228, instead of the $51,433 reported for the same year. The parties resolved these issues by agreement prior to trial.

Torrey Hotel Enterprises, Inc. (THEI), the tax matters partner of IHCL and petitioner in this case, is a California corporation. All of the outstanding shares of stock of THEI were directly or indirectly owned or controlled by Mr. Manchester or members of his family.

## Douglas F. Manchester, PLH, and PGL

In October 1981, Mr. Manchester and his related companies formed Pacific Landmark Hotel, Ltd. (PLH), a California limited partnership. PLH was formed for the purpose of constructing, owning, and managing the first of two hotel towers of a resort complex located adjacent to the then-unbuilt San Diego Convention Center. The first hotel tower was completed in April 1984.

Mr. Manchester formed another limited partnership, Pacific Gateway, Ltd. (PGL), for the purpose of constructing, owning, and managing the second hotel tower. In October 1985, PGL commenced construction of the second hotel tower; it was completed in October 1987.

## IHCL and THEI

Mr. Manchester formed IHCL to hold interests in PLH and PGL. Under the Agreement of Limited Partnership of IHCL, dated October 3, 1985 (the IHCL Original Agreement), the general and tax matters partner of IHCL was THEI, which had a .999-percent interest in IHCL as a general partner and a 99-percent interest as a limited partner. Mr. Manchester held the remaining .001-percent interest.

In 1985, the Home Savings Co. (Home Savings) agreed to provide $208 million to be used as permanent financing for the first hotel tower and as construction financing for the second hotel tower. As a condition for its loans, Home Savings required Mr. Manchester and his businesses to put up a letter of credit for $16 million. THEI, through IHCL,[2] arranged for the $16 million letter of credit, issued by Security Pacific National Bank. In exchange, IHCL received a 35.354-percent limited partnership interest in both PLH and PGL.

Dondi

In November 1985, Dondi Properties (Dondi), which was controlled by Vernon Savings and Loan Association (Vernon), invested in IHCL. Dondi received a 15-percent limited partnership interest in IHCL in exchange for its agreement to provide $19.8 million to the capital of IHCL. As a result of this transaction, THEI's limited partnership share in IHCL was decreased from 99 percent to 84 percent. Mr. Manchester withdrew from IHCL.

The entry of Dondi was reflected in a "Restated and Amended Agreement of Limited Partnership of IHCL", dated November 29, 1985

---

[2] Pursuant to the IHCL Original Agreement, THEI was required to contribute certain letters of credit to the capital of IHCL. THEI did not, however, receive any credit to its capital account as a result of the issuance of any letter of credit.

Pursuant to the IHCL Original Agreement, Mr. Manchester was required to contribute $150 to the capital of IHCL. The record does not indicate whether Mr. Manchester, in fact, made such a contribution.

(the IHCL Restated Agreement). That agreement allocated 99 percent of the net losses of IHCL to Dondi and the other 1 percent to THEI as the general partner. After a period of approximately 5 years, the net losses were to be allocated to the partners on a pro rata basis. The income of IHCL was allocated to the partners, Dondi and THEI, in the same ratio as net losses. The allocation was to continue until such time as IHCL's cumulative income equaled IHCL's cumulative losses; thereafter, IHCL's income would be allocated to the partners pro rata and in proportion to earlier distributions.

In contrast to the allocations of income, section 5 of the IHCL Restated Agreement made the following provisions for actual distributions:

> 5.1 <u>Distribution of Cash Available for Distribution</u>. Cash Available for Distribution, as defined in Section 17, when distributed from time to time, shall be distributed to the Partners as follows:
>
> > 5.1.1. First, upon the release of the letters of credit by the lender as referred to in subsection 4.3.5(a), then to the General Partner up to the amount to which the General Partner is entitled under Section 4.3.5(a).
> >
> > 5.1.2. Second, to the repayment of any Special Loans, <u>pro</u> <u>rata</u>, up to the full amount of the total principal amount of such Special Loans, plus accrued but unpaid interest thereon.
> >
> > 5.1.3. Thereafter, any remaining sum shall be distributed to the Partners, <u>pro rata</u>.

IHCL maintained capital accounts for each of its partners in accordance with section 4.4 of the IHCL Restated Agreement. That provision states, in part:

> 4.4. <u>Capital accounts of Partners</u>. An individual capital account shall be maintained for each Partner to which shall be credited the contributions of such partner to capital of the Partnership. * * * In the event a Partner transfers all or any portion of its Partnership Interest as permitted by this Agreement, the transferee shall succeed to the individual capital account and capital account balance of the transferor to the extent that such individual capital account and capital account balance relate to the transferred Partnership interest.

In connection with Dondi's entry into IHCL, the limited partnership agreements of PGL and PLH were amended to allocate 90.91 percent of their losses to IHCL. At the same time, an additional provision, section 6.5, "minimum gain chargeback", was inserted into each of the IHCL, PLH, and PGL partnership agreements. That provision stated, in part:

> (b) To the extent that the deficit Capital Account balances of one or more Partners attributable to Nonrecourse Deductions and determined after applying subparagraph (a) exceeds [sic] Minimum Gain, such Partners shall be allocated Net Income (or items thereof) in accordance with proposed or final Treasury regulations promulgated under Section 704 of the Code to the extent of and in proportion to the amounts of such differences.

The partnership agreements of IHCL, PLH, and PGL all required that, upon liquidation, distributions to their partners were to be made in accordance with the partners' positive capital account balances. For example, the IHCL Restated Agreement provided that liquidation proceeds were to be used first to pay debts and

establish reserves. Thereafter, section 5.3.4 of the IHCL Restated Agreement directed liquidation proceeds to go--

> To the payment to the Partners, who have positive capital account balances, in proportion to their positive capital account balances, of an amount equal to the sum of the positive balances in the Partners' capital accounts as of the date of such distribution, after giving effect to all contributions, distributions and allocations of Net Income, Net Loss and Gain for all periods, including the period during which such distribution occurs.

As of December 31, 1985, THEI had a beginning capital account value of zero. For 1986, it had a negative capital account value or balance of $1,701,520 for both its general and limited partnership interests. For the next 5 years, its negative capital account balance consistently exceeded $5 million. During the year at issue, THEI did not have a positive capital account balance.

By January 1986, Dondi had contributed $10.8 million to IHCL and agreed to pay the $9 million balance in subsequent quarterly installments. Dondi, however, encountered difficulties and failed to make its payment due January 6, 1987. Accordingly, in April 1987, THEI gave Dondi written notice, under section 4.3.4.2(d) of the IHCL Restated Agreement, that Dondi's allocation of 99 percent of IHCL's losses was terminated. The IHCL Restated Agreement then allocated the net losses of IHCL to the partners pro rata in accordance with their partnership interests. Thereafter, 15 percent of the losses were allocated to Dondi, reflecting its limited partnership interest, and 85 percent of the losses were allocated to THEI, reflecting both its general and limited

partnership interests. This reallocation of losses created the substantial deficit balance in THEI's capital account with IHCL.

Marriott Corp.

In October 1987, the Marriott Corp. became a partner in PLH and PGL. It contributed cash and made loan guaranties to those partnerships in exchange for a 5-percent general partnership interest in each. Marriott also received an allocation of 95 percent of net losses from PLH and, initially, 99 percent of net losses from PGL. These allocations reduced the losses previously allocated to IHCL. The allocation of income, however, remained unchanged.

With regard to IHCL, 99 percent of that partnership's income continued to be allocated to Dondi. At the end of 1987, THEI had a total deficit in its capital account of $5,010,171, while Dondi had a positive capital account of $7,763,183, as a result of these reallocations. At the beginning of 1991, the capital accounts of IHCL indicated a negative capital account totaling $5,920,614 for THEI and a positive capital account of $14,879,392 for Dondi.

Transfer to FDIC and Mr. Manchester

On June 20, 1991, pursuant to ongoing settlement negotiations, Dondi transferred its 15-percent limited partnership interest in IHCL to the Federal Deposit Insurance Corporation (FDIC), as receiver for Vernon. FDIC then transferred this interest in IHCL to Mr. Manchester in exchange for his $5 million payment. A first amendment to the IHCL Restated Agreement, dated June 20, 1991,

admitted Mr. Manchester as a substitute limited partner. Dondi's positive capital account was also transferred to FDIC and then to Mr. Manchester. As a result, THEI held a 1-percent interest as general partner and an 84-percent interest as a limited partner. Mr. Manchester held the remaining 15 percent in limited partnership interests.

The following day, the parties executed a second amendment to the IHCL Restated Agreement. The second amendment provided that IHCL's income would be allocated first to the partners who had negative capital account balances and, thereafter, to the partners pro rata. The second amendment, however, made no pertinent changes to the preexisting allocation of gain, allocation of loss, distribution of cash-flow from operations, distribution of cash from sale or refinancing, or liquidating distributions.

IHCL's 1991 Return

Following execution of the second amendment, 100 percent of IHCL's income was allocated to THEI, in view of its negative capital account. IHCL accordingly filed a 1991 information return, reporting the allocation of 99 percent of net income to Dondi through June 20, 1991, the date Dondi's interest was transferred to Mr. Manchester. The 1991 return reflected that, after June 20, 1991, IHCL had allocated 100 percent of its income to THEI.

The FPAA

Respondent did not accept the allocation of the second amendment to the IHCL Restated Agreement to the extent that 100

percent of partnership income was allocated to THEI. Rather, respondent determined that Mr. Manchester should be allocated 99 percent of IHCL's net income for the period after June 20, 1991. Accordingly, respondent proposed that Mr. Manchester's distributive share of IHCL's income be increased by $814,296 and that his share of tax preference items be increased by $23,490. The reallocation of income reflects the original allocation of income and losses to Dondi: 1 percent to THEI and 99 percent to Mr. Manchester, as Dondi's successor. The FPAA stated that "the adjustments in the distributive shares are determined in accordance with the partners' interest in the partnership as the partnership has not shown that the allocation per the return is an allowable allocation under the provisions of the Internal Revenue Code."

                            OPINION

In order to determine whether IHCL's allocation of the partnership items at issue either has substantial economic effect or is consistent with the partners' interests in the partnership, we must preliminarily review several basic principles of partnership taxation.

## I.  Partnership Taxation

### A.  General Principles

Section 701 provides that a partnership is not liable for Federal income taxes; instead, persons carrying on business as partners are liable in their separate or individual capacities for the income taxes arising from partnership operations. In

determining his income tax, a partner must take into account his "distributive share" of each item of partnership income, gain, loss, deduction, and credit. Sec. 702. Each partner is taxed on his distributive share of partnership income without regard to whether the income is actually distributed to him. Sec. 1.702-1(a), Income Tax Regs.

Section 704(a) provides the framework for the determination of a partner's distributive share of partnership income, gain, loss, deductions, or credits of the partnership. In general, the partnership agreement determines a partner's distributive share of these items. Sec. 704(a). These provisions provide a great deal of flexibility to taxpayers who do business in the form of a partnership. Partners have "great latitude in determining themselves by their partnership agreement what their distributive shares will be." Goldfine v. Commissioner, 80 T.C. 843, 849-850 (1983). However, the partners' ability to make special allocations of partnership items is not unrestricted. The allocation of partnership interests must have substantial economic effect. Sec. 704(b). Moreover, "if * * * the allocation to a partner under the agreement of income, gain, loss, deduction, or credit (or item thereof) does not have substantial economic effect", then the partner's distributive share of these items "shall be determined in accordance with the partner's interest in the partnership (determined by taking into account all facts and circumstances)". Sec. 704(b). Thus, in the absence of substantial economic effect,

the Commissioner can reallocate partnership items in accordance with the partners' interests in the partnership as determined under section 1.704-1(b)(3), Income Tax Regs.

In the instant case, respondent determined that the allocation of all of IHCL's income for the latter part of 1991 to THEI lacks substantial economic effect and is not deemed to be in accordance with THEI's interest in IHCL. Therefore, respondent reallocated 99 percent of IHCL's income for the period following June 20, 1991, to Mr. Manchester. Petitioner disputes this reallocation.

## B. The Section 704 Regulations

The section 704(b) regulations describe in detail not only the circumstances in which a partnership's allocations will have "substantial economic effect" but also the manner of determining a partner's "interest in the partnership".

### 1. Substantial Economic Effect

#### a. Basic Principles

To have substantial economic effect, the partnership allocations must reflect the actual division of income or loss among the partners when viewed from the standpoint of economic, rather than tax, consequences. Goldfine v. Commissioner, supra at 851-852. To this end, the regulations provide that an allocation has substantial economic effect, if, in the event there is an economic benefit or burden that corresponds to an allocation, the partner receiving that allocation receives the corresponding benefit or burden. Sec. 1.704-1(b)(2)(ii), Income Tax Regs.

Additionally, the economic effect of the allocation must be substantial; this requires "a reasonable possibility that the allocation (or allocations) will affect substantially the dollar amounts to be received by the partners from the partnership, independent of tax consequences." Sec. 1.704-1(b)(2)(iii)(a), Income Tax Regs.

### b.  Capital Accounts

Determinations of substantial economic effect, as well as determinations of a partner's interest in the partnership, depend upon an analysis of the partners' capital accounts. Generally speaking, a partner's capital account represents the partner's equity investment in the partnership. The capital account balance is determined by adding (1) the amount of money that the partner contributes to the partnership, (2) the fair market value of property the partner contributes (net of liabilities to which the property is subject or which are assumed by the partnership), and (3) any allocations of partnership income or gain. A partner's capital account is decreased, however, by the amount of money that the partnership distributes to the partner, and by the amount of any allocation to such partner of losses and deductions. The capital account is also reduced by the fair market value of property distributed to the partner, net of any liability that the partner assumes, or to which the property is subject. Sec. 1.704-1(b)(2)(iv), Income Tax Regs.

Conceptually, if a partner has a positive capital account on the date of liquidation, the partnership owes him that amount. If, however, the partner has a negative capital account on the date of liquidation, the partner in theory owes that amount to the partnership--or, as a practical matter, to those partners having positive capital accounts.

### c. The Three Tests of Economic Effect

The regulations governing the economic effect of partnership allocations contain three tests that in a sense serve as "safe harbors". Partnership allocations are deemed to have economic effect if they are made pursuant to a partnership agreement that meets the requirements of any one of these tests. An understanding of how these tests operate helps to establish the background for the parties' contrasting arguments.

### (1) The Basic Test

The basic test for economic effect is set forth in the regulations. Section 1.704-1(b)(2)(ii)(b), Income Tax Regs., provides, in general, that an allocation will have economic effect if the partnership agreement contains provisions that require: (1) The determination and maintenance of the partners' capital accounts are to be in accordance with the rules of section 1.704-1(b)(2)(iv), Income Tax Regs.; (2) upon liquidation of the partnership, the proceeds of liquidation are to be distributed in accordance with the partners' positive capital account balances; and (3) upon liquidation of the partnership, all partners having a

deficit capital account must restore the amount of the deficit balance to the partnership. These three requirements are a distillation of earlier case law in which this Court analyzed whether partnership allocations possessed substantial economic effect. See, e.g., Orrisch v. Commissioner, 55 T.C. 395, 403-404 (1970); Kresser v. Commissioner, 54 T.C. 1621 (1970).

With respect to the case before us, the parties agree that the IHCL Restated Agreement complies with the first two requirements. The agreement provides that the partners' capital accounts will be properly maintained and that liquidation proceeds will go to the partners in proportion to their positive capital accounts. With respect to the third requirement, however, neither the IHCL Restated Agreement, nor any of its amendments, include a provision requiring the partners to restore any deficits in their capital accounts to the partnership upon liquidation. Accordingly, it is undisputed that the IHCL allocation at issue does not meet the basic test of substantial economic effect.

### (2)  Alternative Test of Economic Effect

The regulations provide an alternative test of economic effect--one which accommodates the existence of limited partnerships. Limited partnership agreements usually provide specific limits upon the amount the limited partners are required to contribute to the partnership. These limits on liability, however, are inconsistent with the requirement in the basic test that upon liquidation each partner must agree to repay any deficit

in that partner's capital account. Consequently, the alternative test for economic effect provides that allocations of a limited partnership may have economic effect even in the absence of an unlimited deficit restoration requirement.

The alternative test begins by incorporating the first two parts of the basic test.  As with the basic test, the partnership agreement must provide for properly maintained capital accounts. It must also provide that the proceeds of liquidation are to be distributed in accordance with the partners' positive capital account balances.  However, instead of a negative capital account makeup requirement, the alternative test mandates a hypothetical reduction of the partners' capital accounts. Specifically, the alternative test requires that capital accounts must be reduced for any distributions that, as of the end of the year, "reasonably are expected" to be made, to the extent that such distributions exceed reasonably expected increases to the partner's capital account. Sec. 1.704-1(b)(2)(ii)(d), Income Tax Regs. By requiring a prospective reduction of capital accounts, the alternative test serves to preclude a limited partner from timing the receipt of deductible partnership expenses in a way that permits the partner to accumulate negative capital accounts that the partner is not required to repay.

Additionally, under the alternative test, the partnership agreement must provide for a "qualified income offset" (QIO).  A QIO provision automatically allocates income, including gross

income and gain, to a partner who has an unexpected negative capital account, either as a result of partnership operations or as a result of making the adjustment for reasonably expected reductions. The QIO must operate "in an amount and manner sufficient to eliminate such deficit balance as quickly as possible." Sec. 1.704-1(b)(2)(ii)(d), flush language, Income Tax Regs.

In the present case, neither the IHCL Original Agreement nor the IHCL Restated Agreement contains a provision requiring capital account adjustments for reasonably expected distributions or a "qualified income offset". To be sure, the second amendment to the IHCL Restated Agreement does provide for a net income allocation to pay off THEI's deficit capital account. However, the second amendment falls short of the requirements for a QIO. The second amendment allocates only net income, not "a pro rata portion of each item of partnership income", allocated "in an amount and manner sufficient to eliminate such deficit balance as quickly as possible." Sec. 1.704-1(b)(2)(ii)(d), Income Tax Regs. Thus, the second amendment was not designed to provide a prompt repayment of unforeseen negative capital accounts. Rather, the partners are permitted to accumulate very large deficit accounts over a number of years. Petitioner does not seriously argue otherwise. Consequently, the IHCL partnership allocations fail to meet the alternative test of economic effect.

### (3)  Economic Equivalence Test

There is another economic effect "safe harbor" (which is of limited application), referred to as the "economic equivalence test". Section 1.704-1(b)(2)(ii)(i), Income Tax Regs., provides that, in the event that an allocation would produce the economic equivalent of meeting the basic test for economic effect, it will be deemed to have economic effect even if it does not otherwise meet the formal requirements of the basic test. This economic equivalence test is likely to be met only by the least complicated partnerships.  Here, neither party maintains that the allocations in this complex multitiered partnership situation would have the equivalent economic effect of meeting the basic test.  To the contrary, the existence of large deficit capital accounts with no obligation to repay would appear to preclude the meeting of that test here.  Thus, the IHCL partnership fails to meet this "safe harbor" test.

### 2.  Partners' Interests in the Partnership

### The General Rule

Section 704(b) provides that an allocation of partnership income, gain, loss, deductions, or credit (or item thereof) that does not meet the requirements for substantial economic effect will be "determined in accordance with the partner's interest in the partnership".  This requirement, although less specific than the test for economic effect, nevertheless requires that partnership allocations be analyzed on the basis of their actual economic

impact. Accordingly, the regulations provide that an examination of a partner's interest in the partnership "shall be made by taking into account all facts and circumstances relating to the economic arrangement of the partners." Sec. 1.704-1(b)(3)(i), Income Tax Regs. There is, however, a specific provision in the regulations on which petitioner and respondent both rely to demonstrate the correctness of their respective positions in this case. To this provision we now turn.

### 3. Special Rules for Determining Partners' Interests

The "partners' interest" regulations contain a special provision for "certain determinations" in ascertaining the partner's interest in the partnership. This special provision applies only when a partnership's allocations lack economic effect under section 1.704-1(b)(2)(ii), Income Tax Regs. To satisfy this special provision, the partnership agreement must meet the first two parts of the basic test for economic effect. That is, the agreement must provide both that capital accounts are to be properly maintained and that liquidating distributions will be made only to partners with positive capital accounts. When these conditions are met, the special provision may be applied to determine whether the allocations are in accordance with partnership interests.

Under the special provision, a partner's interest is measured by comparing the amount the partner would receive in a hypothetical liquidation at the end of the current year with the amount the

partner would have received in a liquidation at the end of the prior year. This is referred to as the comparative liquidation test. Specifically:

> the partner's interests in the partnership with respect to the portion of the allocation that lacks economic effect will be determined by comparing the manner in which distributions (and contributions) would be made if all partnership property were sold at book value and the partnership were liquidated immediately following the end of the taxable year to which the allocation relates with the manner in which distributions (and contributions) would be made if all partnership property were sold at book value and the partnership were liquidated immediately following the end of the prior taxable year, and adjusting the result for the items described in (4), (5), and (6) of paragraph (b)(2)(ii)(d) of this section. A determination made under this paragraph (b)(3)(iii) will have no force if the economic effect of valid allocations made in the same manner is insubstantial under paragraph (b)(2)(iii) of this section. * * *

Sec. 1.704-1(b)(3)(iii), Income Tax Regs.

Under the comparative liquidation test, if allocation of an item of partnership loss or deduction is at issue, the regulation requires that the loss or deduction be attributed to the partner who would be required to make up a deficit in partnership assets upon liquidation.

Both parties maintain that this comparative liquidation test applies to show that their allocation schemes are in accordance with the partners' interests. The manner in which each applies the test, however, differs. Respondent's application of the comparative liquidation test is somewhat less complex than petitioner's. Accordingly, we consider respondent's contentions first.

C.  Respondent's Contentions

Respondent asserts that the comparative liquidation test of section 1.704-1(b)(3)(iii), Income Tax Regs., supports the allocation of all partnership income to Mr. Manchester, as set forth in the FPAA.  First, respondent contends that if all IHCL's assets had been sold at the end of 1990, the net liquidation proceeds would have been $8,958,778.  This amount, using stipulated figures, is computed as follows:

Assets:

| | |
|---|---|
| Cash | $7,955,796 |
| Investment in Landmark | (1,358,431) |
| Investment in Gateway | 2,328,218 |
| Unamortized organization costs | [1]39,388 |
| Total assets | $8,964,971 |

Liabilities:

| | |
|---|---|
| Accounts payable | (6,193) |
| Total liabilities | (6,193) |
| Net proceeds | 8,958,778 |

[1] On brief, respondent eliminated the unamortized organization costs; thus, respondent's figures for total assets and net proceeds are $39,388 less than indicated above.  Without passing upon the correctness of this omission, we have included these costs in order to make respondent's and petitioner's figures more easily comparable.

Next, respondent contends that if all the IHCL assets had been sold at the end of 1991, the net liquidation proceeds would have been $10,449,135.  This amount is computed as follows:

Assets:

| | | |
|---|---|---|
| Cash | $9,098,388 | |
| Investment in Landmark | (3,967,304) | |
| Investment in Gateway | 2,660,677 | |
| Note receivable from THEI | 2,619,833 | |
| Unamortized organization costs | 39,388 | |
|    Total assets | | $10,450,982 |

Liabilities:

| | | |
|---|---|---|
| Accounts payable | (1,847) | |
|    Total liabilities | | (1,847) |
| | | |
| Net proceeds | | 10,449,135 |

Respondent asserts that, at the end of the first year (1990), all the liquidation proceeds would have gone to Dondi, which was the only partner to have a positive capital account. Further, respondent claims the amount available upon liquidation is $5,960,002 less than the capital account balance of $14,879,392 for Dondi. Respondent points out that, because there is no provision in the IHCL Restated Agreement for a deficit makeup, THEI would not have been required to make up the shortfall, although it had a negative capital account totaling $5,920,614.

At the end of the second year (1991), the net book value of IHCL's assets exceeded $10 million. Respondent contends that under the IHCL Restated Agreement all of the increase in book value would have been distributed to Mr. Manchester, as successor to Dondi's interest in IHCL, because Mr. Manchester was the only partner with a positive capital account at the end of 1991. Respondent points out that the amount available for distribution is approximately $5 million less than the positive balance in Mr. Manchester's capital

account. Again, because the IHCL Restated Agreement does not contain a deficit makeup provision, THEI would not have been required to make up the shortfall.

Respondent concludes that the application of the IHCL Restated Agreement supports the determination made in the FPAA--that Mr. Manchester, who, at the end of 1991, had the only positive capital account in IHCL, would have been the only party to receive liquidation proceeds; accordingly, all the post-June 20, 1991, income of IHCL must be allocated to him because he is the sole partner with a positive capital interest in IHCL.

### D. Petitioner's Contentions

Petitioner disagrees with respondent's conclusions. Petitioner contends that respondent has erroneously failed to include in the deemed liquidation proceeds approximately $7 million for both 1990 and 1991 as "minimum gain allocations". Petitioners' argument requires further exploration of the partnership allocation regulations, specifically as they relate to allocations of nonrecourse deductions.

### 1. Partnership Minimum Gain

A nonrecourse debt is one in which the lender, upon the debtor's default, has as its only recourse the institution of foreclosure proceedings with respect to the property securing the debt. (In a nonrecourse debt situation, the lender has agreed that it will not maintain a collection action against the debtor personally.) Thus, if the value of the property securing the debt

falls below the amount of the debt, it is the lender, and not the debtor, who bears the risk of loss.

Nevertheless, it is well settled that nonrecourse liabilities incurred to acquire property will constitute a part of the debtor's cost basis in the property it has purchased. Crane v. Commissioner, 331 U.S. 1, 14 (1947). Accordingly, the debtor may claim deductions attributable to that debt--such as deductions for depreciation.[3] However, when the debtor disposes of the property, the debtor must include in its amount realized from the disposition of the property the amount of any nonrecourse debt to which the property is subject. Thus, if the debtor has taken deductions (such as depreciation deductions) that have lowered its cost basis in the property to an amount less than the amount of the nonrecourse debt, the debtor must recognize gain at least to the extent that its basis is exceeded by the amount of debt secured by the property. Commissioner v. Tufts, 461 U.S. 300, 307 (1983).

These nonrecourse debt principles apply to partnerships. Not surprisingly, application of these rules to partnership allocations produces some fairly complicated situations. If a partnership has

---

[3]    A purchaser's basis in an asset is, initially, its cost. Sec. 1012. The Supreme Court in Crane v. Commissioner, 331 U.S. 1 (1947), established that the cost basis of an asset includes nonrecourse indebtedness borrowed to purchase the asset. See Mayerson v. Commissioner, 47 T.C. 340, 351-352 (1966). The Internal Revenue Code provides that the basis is to be adjusted to take into account certain factors, such as deductions for depreciation under sec. 167(g). Sec. 1016(a) provides that such deductions lower the amount of the purchaser's basis in the property.

acquired properties with nonrecourse debt, the partnership's deduction of expenses associated with these properties--such as expenses for depreciation--may lead to a situation where the amount of nonrecourse debt exceeds the partnership's basis in the properties securing that debt. Such deductions--called "nonrecourse deductions"--per se do not have economic effect. The lack of economic effect arises from the fact that the lender, and not the partnership or its partners, bears the economic risk of loss with respect to the nonrecourse deductions.

### 2. Minimum Gain Chargeback

As applicable to the taxable year at issue, there are temporary regulations governing the allocation of deductions attributable to nonrecourse debt. These regulation provisions are set forth as sections 1.704-1T(b)(4) and (5), Temporary Income Tax Regs., 53 Fed. Reg. 53162-53173 (Dec. 30, 1988). The regulatory provisions involve the concepts of "minimum gain" and "minimum gain chargebacks". These provisions represent the application of the principle of Commissioner v. Tufts, supra, in a partnership context.

"Minimum gain" is created when a partnership claims deductions, such as deductions for depreciation, that decrease the partnership's basis in a given property to an amount less than the balance of the nonrecourse debt incurred in the acquisition of that property.

The event that triggers a "minimum gain chargeback" is a decrease in partnership minimum gain. That can occur, for example, when a partnership disposes of property in respect of which the partnership's nonrecourse indebtedness exceeds the partnership's basis. It is this type of event that, under Tufts, triggers the realization of gain by the partnership, at least to the extent the amount of the partnership's acquisition indebtedness exceeds the partnership's basis in that property. For example, assume that a partnership owed $1 million in nonrecourse debt that it used to acquire depreciable property. If the partnership then claimed a $200,000 depreciation deduction, which would lower its $1 million basis in the property to $800,000, the $200,000 (the amount by which the debt exceeds the partnership's basis) would be the "minimum gain". This $200,000 is the potential gain that the partnership would realize as a "minimum gain" when the partnership disposes of that property. Thus, if the lender foreclosed upon the property, the partnership would realize at least a "minimum gain" of $200,000, even though the partnership received no gain in an economic sense.

The $200,000 "minimum gain chargeback" is the minimum gain as allocated to the partners in proportion to the amount of their distributive share of the nonrecourse deductions, thereby increasing their partnership capital accounts.[4] Allocation of such

---

[4] Specifically, sec. 1.704-1T(b)(4)(iv)(e), Temporary
(continued...)

gain to the partners also increases the partners' exposure to income taxation on the amounts of the gain.

### 3. Petitioner's Application of Minimum Gain Provisions to a Tiered-Partnership Allocation

Petitioner maintains that the minimum gain chargeback provisions of section 6.5 in the IHCL Restated Agreement would require IHCL to realize approximately $7 million in minimum gain chargebacks in the deemed liquidation. Petitioner's assertion is based on the following theory: although IHCL owned no nonrecourse property itself, it had ownership interests in PLH and PGL, which

---

[4](...continued)
Income Tax Regs., 53 Fed. Reg. 53163 (Dec. 30, 1988), provides:

   (e) Minimum gain chargeback--(1) In general. If there is a net decrease in partnership minimum gain for a partnership taxable year, the partners must be allocated items of partnership income and gain in accordance with this paragraph (b)(4)(iv)(e) ("minimum gain chargeback").

   (2) Allocations required pursuant to minimum gain chargeback. If a minimum gain chargeback is required for a partnership taxable year, then each partner must be allocated items of income and gain for such year (and, if necessary, for subsequent years) in proportion to, and to the extent of, an amount equal to the greater of--

      (i) The portion of such partner's share of the net decrease in partnership minimum gain during such year that is allocable to the disposition of partnership property subject to one or more nonrecourse liabilities of the partnership; or

      (ii) The deficit balance in such partner's capital account at the end of such year * * *

did own such properties. Petitioner then posits that IHCL's ownership of interests in these lower tier partnerships is, in effect, a proportionate ownership interest in the properties of those lower tier partnerships as well. Petitioner points to the regulations governing allocation of nonrecourse deductions; these expressly provide a "look-through" rule for situations involving tiered partnerships. Petitioner posits that for purposes of the nonrecourse deductions, the "look-through" rule is designed to produce the same consequences for the upper tier partnership, in this case IHCL, that would have resulted had IHCL directly held its proportionate share of the properties owned by PGL and PLH. Petitioner reasons that under these regulations, had PLH or PGL incurred minimum gains on the disposition of their property, IHCL would be required to realize its proportionate share of those gains. Sec. 1.704-1T(b)(4)(iv)(j), Temporary Income Tax Regs., 53 Fed. Reg. 53166 (Dec. 30, 1988); see T.D. 8237, 1989-1 C.B. 180, 206.

Petitioner further contends that IHCL should be treated as owning its proportionate share of PLH's and PGL's assets for purposes of the comparative liquidation test of section 1.704-1(b)(3)(iii), Income Tax Regs. Thus, according to petitioner, a deemed liquidation of IHCL would imply a deemed liquidation of PLH and PGL as well; as a result, the disposition of those nonrecourse properties (upon the liquidations of PLH and PGL) would trigger minimum gain chargebacks to IHCL.

In making its point, petitioner uses the same figures as respondent. Petitioner augments those figures, however, with substantial amounts of minimum gain chargebacks for both 1990 and 1991. First, petitioner contends that if all of IHCL's assets had been liquidated at the end of 1990, the net liquidation proceeds would have been $16,328,755. This amount is computed as follows:

Assets

| | |
|---|---|
| Cash | $7,955,796 |
| Organization costs | 39,388 |
| Investment in Pacific Gateway | 2,328,218 |
| Investment in Pacific Landmark | (1,358,431) |
| Liabilities | (6,193) |
| Subtotal | 8,958,778 |
| 1990 Minimum gain chargeback from Pacific Landmark[1] | 7,369,977 |
| Distributable liquidation proceeds at book value 1/1/91 | 16,328,755 |

[1] Petitioner's figures include only minimum gain chargebacks traceable to the PLH partnership. Apparently, S.D. Hotels, one of PGL's partners, guaranteed the payment of PGL's obligation to Home Savings. This guaranty restricted use of PGL's nonrecourse deductions to S.D. Hotels, which bore the economic risk of loss on the property. See sec. 1.704-1T(b)(4)(iv)(h)(2), Temporary Income Tax Regs., 53 Fed. Reg. 53164 (Dec. 30, 1988).

Petitioner then contends that $5,920,614 of the minimum gain chargeback would be used first to eliminate THEI's negative capital account. The balance of the minimum gain chargeback, plus the liquidation proceeds, would then be distributed pursuant to the IHCL Restated Agreement as it was in effect during 1990. Thus, according to petitioner, 85 percent, or $1,231,959, would be

allocated to THEI and 15 percent, or $217,404, would be allocated to Dondi. These allocations, when added to the previously accumulated capital accounts, result in a total capital of $16,328,755--the amount of the previously identified liquidation proceeds.

Petitioner maintains that a liquidation of all of IHCL's assets at the end of 1991 would yield proceeds of $17,887,056. This amount is computed as follows:

12-31-91 Deemed Liquidation

| | |
|---|---:|
| Cash | $9,098,388 |
| Organization costs | 39,388 |
| Note receivable from THEI | 2,619,833 |
| Investment in Pacific Gateway | 2,660,677 |
| Investment in Pacific Landmark | (3,967,304) |
| Liabilities | (1,847) |
| Subtotal | 10,449,135 |
| 1991 Minimum gain chargeback from Pacific Landmark | 7,437,891 |
| Distributable liquidation proceeds at book value 12-31-91 | 17,887,026 |

This $17,887,026 amount is $1,558,301 more than that for the previous year (1990), consisting of an additional $67,914 in minimum gain chargebacks, plus partnership income for 1991 of $1,490,387. The total liquidation proceeds, as determined by petitioner, would again eliminate THEI's negative capital account. These allocations, when added to the previously accumulated capital accounts, result in a total capital of $17,887,056--the amount of

the previously identified liquidation proceeds available for 1991. Distributions would be made in accordance with the IHCL Restated Agreement as it read at the end of 1991. Petitioner asserts that because the second amendment precluded Mr. Manchester from receiving any net income for 1991, THEI, the only other partner in IHCL, would be allocated 100 percent of such income.

E. Does the Comparative Liquidation Test Contemplate a Liquidation of the Lower Tier Partnerships?

The difference between respondent's and petitioner's theories of the comparative liquidations arises from petitioner's contention that a deemed liquidation of IHCL must also involve a deemed liquidation of PLH and PGL (the lower tier partnerships) and the resulting minimum gain chargebacks.

Under the facts of this case, however, we do not believe that the comparative liquidation test permits a deemed liquidation of IHCL to include a deemed liquidation of PLH and PGL.

Section 704 provides that we must determine the interests of the partners in accordance with all relevant facts and circumstances. IHCL had a 35.354-percent interest in each of the lower tier partnerships. As a limited partner with only a minority interest in each of the lower tier partnerships, IHCL could not control the lower tier partnerships. Thus, it could not force partnership minimum gain chargebacks by requiring PLH and PGL to dissolve or to dispose of their property in a way that caused a

decrease in partnership minimum gain--and resulting chargebacks to IHCL.

Sections 11 and 15 of the IHCL Restated Agreement provide that no partner has the right to sell substantially all the assets or cause a dissolution of PLH. Rather, under those provisions of the IHCL Restated Agreement, an effective election to sell the assets of the partnership, or to dissolve it, could come about only with the concurrence of the majority of the limited partners, the permission of the general partner, the permission of the San Diego public authorities, and the permission of any lender who had the right to approve such a dissolution.

The statutory framework of the California Corporations Code permits a partner to dissolve its partnership only in similarly limited circumstances. Section 15681 of the California Corporations Code (West 1991) provides in pertinent part:

Section 15681. Nonjudicial dissolution.

A limited partnership is dissolved and its affairs shall be wound up upon the happening of the first to occur of the following:

(a) At the time or upon the happening of events specified in the partnership agreement.

(b) Except as otherwise provided in the partnership agreement, written consent of all general partners and a majority in interest of the limited partners.

Likewise, section 708(b) of the Internal Revenue Code provides for a termination of a partnership if within a 12-month period there is a sale or exchange of 50 percent or more of the

total interest in the partnership capital or profits. Sec. 708(b)(1)(B); cf. Rev. Rul. 87-50, 1987-1 C.B. 157; Rev. Rul. 87-51, 1987-1 C.B. 158.

If IHCL were to liquidate, it would not have the power to compel PLH or PGL to dissolve. Nor could IHCL otherwise require PLH or PGL to transfer its assets, either directly or indirectly. Those properties would remain under the control of PLH and PGL. Upon liquidation IHCL could distribute only its partnership interests in PLH or PGL. The distinction between a partner's interest in a partnership and the partner's lack of interest in partnership property is basic. California law follows general partnership law in providing that "An interest in a limited partnership is personal property and a partner has no interest in specific partnership property." Cal. Corp. Code sec. 15671 (West 1991 & Supp. 1995). Federal tax law makes a similar distinction between interests in partnerships and the holdings of partnerships. As some commentators have explained, for purposes of the Internal Revenue Code:

> The transferred interest is treated as a separate intangible asset, detached from the assets of the partnership. Accordingly, the various Code provisions governing the amount and character of gain or loss, basis, and holding period operate with respect to the transferred partnership interest, rather than the underlying partnership assets. * * *

McKee et al., Federal Taxation of Partnerships and Partners, par. 15.01, at 15-3 (3d ed. 1997).

We believe that because IHCL could not force PLH and PGL to dispose of the property that generated the nonrecourse deductions, petitioner's argument fails.  There would be no decrease in PLH's or PGL's minimum gain upon a deemed liquidation of IHCL.  Sec. 1.704-1T(b)(4)(iv)(d), Temporary Income Tax Regs., 53 Fed. Reg. 53163 (Dec. 30, 1988).  Thus, there would be no minimum gain chargeback to IHCL. Sec. 1.704-1T(b)(4)(iv)(f), Temporary Income Tax Regs., 53 Fed. Reg. 53163 (Dec. 30, 1988).  Correspondingly, there would not be, as petitioner contends, an increase in the partners' capital accounts sufficient both to eliminate THEI's deficit account and to pay the positive capital account of Mr. Manchester.  To the contrary, petitioner has failed to refute respondent's position that Mr. Manchester alone would be eligible to receive any gain upon liquidation of the partnership under the IHCL Restated Agreement. (That agreement mandates that, upon liquidation, distributions are to be made in accordance with the partners' positive capital account balances.) Accordingly, we reject petitioner's argument that allocation of partnership income to THEI  is in accordance with the comparative liquidation test of section 1.704-1(b)(3)(iii), Income Tax Regs.[5]

---

[5]    In this case, we expressly do not decide whether the comparative liquidation test in sec. 1.704-1(b)(3)(iii), Income Tax Regs., would take into account the dissolution of lower tier partnerships when the upper tier partnership (whose allocations are at issue) can compel such a dissolution.

F.  The Facts and Circumstances Regulations

Both parties have made alternative arguments dependent upon other factors listed in the regulations as appropriate for consideration in resolving issues of partners' interests.  The four factors to be considered are:  (1) The partners' relative contributions;  (2) the partners' interests in economic profits and losses;  (3) the partners' interests in cash-flow and other nonliquidating distributions; and (4) the partners' rights to distributions of capital upon liquidation.  Sec. 1.704-1(b)(3)(ii), Income Tax Regs.

In this case, petitioner has failed to establish that these four factors support its position that THEI rather than Mr. Manchester should be allocated substantially all (99 percent) of IHCL's income for the period after June 20, 1991.

As to the first factor, i.e., contributions, neither THEI nor Mr. Manchester (except for a possible $150 contribution) made any contributions to IHCL. To be sure, THEI participated in some manner in acquiring a loan guaranty for IHCL, but THEI was given no credit in its capital account for such an endeavor.  Mr. Manchester invested $5 million, but he did so to acquire Dondi's interest in IHCL; he did not invest in IHCL himself.

In regard to the second factor, i.e., the partners' interests in economic profits and losses, although the second amendment to the IHCL Restated Agreement allocated all net income to THEI,

petitioner has failed to refute respondent's determination that this allocation did not comport with the partners' interests.

The third factor, i.e., dealing with cash-flow, is addressed in paragraph 5.1 of the Second Amendment to the IHCL Restated Agreement. It provides that partnership cash will be distributed first to pay off any special loans (there apparently were none), then to the partners to the extent of capital contributed, and then to the partners pro rata. Here, THEI has made no capital contribution. Nor has THEI received any cash. And its potential pro rata receipt of cash from the partnership is too attenuated for us to consider.

We have already seen that the fourth factor, i.e., the right to capital on distribution, favors Mr. Manchester, who had the only positive capital account.

In summary, this analysis of the "facts and circumstances" factors does not support petitioner's position that 99 percent of IHCL's net income for the period at issue is properly allocated to THEI.

II. Vecchio v. Commissioner

Petitioner asserts that this Court has specifically approved the allocation of partnership income to repay negative capital accounts in Vecchio v. Commissioner, 103 T.C. 170 (1994). But Vecchio is not a blanket approval of allocations to offset any negative capital account. The present case materially differs from Vecchio. Here, THEI was always subject to the provision in the

IHCL Restated Agreement that liquidating distributions would go to the partners with positive capital accounts. In contrast, the partnership agreement in Vecchio provided that, upon sale of the real property or liquidation, the limited partner was to receive a return of its investment as well as payment of its negative capital account balance before distributions could be made to the other partners. We therein approved an allocation of income to restore a negative capital account.

A number of other facts and circumstances underscore the differences between Vecchio and the situation here. In Vecchio, the limited partner invested $776,000 in the partnership. It did so as an independent investor. In the instant case, THEI never made an affirmative investment in IHCL. THEI, in fact, appears to be no more than an accommodation entity, established and controlled by its partner, Mr. Manchester, to serve his interests.

Additionally, in this case there is no specific cash, like the $1,986,913 at issue in Vecchio, available to pay both THEI for its negative capital account and Mr. Manchester for his positive capital account. To the contrary, as demonstrated above, it would appear impossible for IHCL to obtain a sufficient amount of money because IHCL lacked the power to force the liquidation of the lower tier partnerships.[6]

---

[6] Petitioner has attached to its reply brief several Schedules C, derived from exhibits admitted at trial. Petitioner makes reference to these schedules in an attempt to demonstrate

(continued...)

Under these circumstances, we conclude that petitioner's reliance upon Vecchio is misplaced.

## III. Respondent's Prior Activities Do Not Require a Different Result

Petitioner argues that respondent accepted its partnership allocations and capital account entries prior to 1991. Petitioner asserts that this acquiescence underscores the strength of its argument that THEI should be allocated all the net income for the period following June 20, 1991. We disagree. In general, the fact that a taxpayer's treatment of an item on a tax return in a prior year is accepted by the Commissioner's agents in audits of the taxpayer's prior return does not preclude or estop the Commissioner, in a later year, from determining that an item should be treated differently. See Hawkins v. Commissioner, 713 F.2d 347, 351-352 (8th Cir. 1983), affg. T.C. Memo. 1982-451; Easter v. Commissioner, 338 F.2d 968 (4th Cir. 1964), affg. per curiam T.C. Memo. 1964-58; Estate of Emerson v. Commissioner, 67 T.C. 612, 617-618 (1977); Coors v. Commissioner, 60 T.C. 368, 406 (1973), affd. 519 F.2d 1280 (10th Cir. 1975).

---

(...continued)
that a liquidation of PGL and PLH would provide adequate cash to pay off THEI's negative capital account, repay Mr. Manchester's positive capital account, and leave a surplus of cash to be allocated pursuant to the 85-to-15 ratio specified in the IHCL Restated Agreement. These schedules leave us with many unanswered questions, especially with regard to the extremely large negative capital account balances of PGL and PLH. Petitioner's presentation of this argument has failed to convince us that upon liquidation of IHCL, THEI would have completely restored its negative capital account.

Petitioner further argues that, in some instances, representations made by respondent's counsel to the Court precluded petitioner from presenting evidence regarding certain issues respondent raised on brief. We have reviewed those instances. Most of those representations pertain to collateral issues that we have found it unnecessary to address. Instead, we have decided this case on the basis of the issues presented at trial and fully briefed thereafter, including the comparative liquidation test of section 1.704-1(b)(3)(iii), Income Tax Regs., the "facts and circumstances" test of section 704(b), and the applicability of Vecchio.

The issues raised by the pleadings place upon the taxpayer the burden of showing every necessary requirement to sustain its burden of proof. Axelrod v. Commissioner, 56 T.C. 248, 255 (1971). In the instant case, the FPAA, as well as the applicable sections of the Internal Revenue Code and regulations, adequately set forth the matters petitioner was required to demonstrate in order to carry its burden of proof. Petitioner has failed to carry its burden of showing that respondent's reallocation of partnership income to Mr. Manchester was erroneous.

To reflect the foregoing and the parties' concessions,

Decision will be entered
under Rule 155.